[PHILADELPHIA, JANUARY 30, 1830.]

| BRUCH, who survived IHRIE, *against* LANTZ, with notice to PORTER and others, Terretenants.

### APPEAL.

A sale of real estate by an executor, indirectly to himself, in pursuance of a power in a will, is not a good execution of the power, but the executor takes the estate clothed with the same trusts to which it was subject in his hands previous to the sale; and it matters not whether the executor made advantage by his purchase or not.

Such a sale is not *void*, but *voidable*. It may be ratified by those who are entitled to call it in question; but a ratification by the heirs and devisees will not prevent the creditors of the testator from taking the land in execution as his estate.

The act of the 4th of *April*, 1797, limiting the lien of debts on the real estate of a decedent to seven years; protects such estate only in the hands of a *bona fide* purchaser, and not in the hands of an executor, who has himself become the purchaser.

APPEAL from the Circuit Court of *Northampton* county.

This was a *Scire Facias* on a judgment confessed by *Jacob Lantz* to *George Ihrie*, Esq. and *George Bruch*, in the Court of Common Pleas of *Northampton* county, upon the 17th day of *August*, 1822, for one thousand seven hundred and eleven dollars and ten cents, which had been revived to *November* Term, 1824, against the defendant, *Lantz*. The *Scire Facias* was issued in the same court to *August* Term, 1827, against the defendant, *Jacob Lantz*, and terretenants. The sheriff returned the writ, "made known to *Jacob Lantz*, the defendant, and to *Jacob Raub*, *Catherine Lantz*, and *James M. Porter*, terretenants." Pending the *Scire Facias*, *George Ihrie*, Esq., one of the plaintiffs, died. The terretenants removed the cause into this court by *Certiorari*, and it was tried at the *April* Circuit Court, 1829, before Judge ROGERS. The terretenants, *Jacob Raub* and *Catherine Lantz*, put in a disclaimer, as will be seen by the pleadings below, and the cause was tried on the defence made by the terretenant, *Porter*. After the evidence was gone through, a verdict was, by consent, entered for the plaintiff, the terretenant to move for a new trial, and bring the whole case up before the Supreme Court upon the evidence. The defendant pleaded as follows:—

"And the said *James M. Porter*, by *Joel Jones*, his attorney, comes and says, that the said plaintiffs ought not to have execution against him of the debt and damages aforesaid, to be levied of the lands and tenements whereof he is returned a tenant, because, he says, that heretofore, to wit: on the 19th day of *January*, Anno Domini, 1816, one *Peter Lantz*, now deceased, was seised in his demesne as of fee, of and in the lands and tenements aforesaid, and

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terretenants.)

being so seised, afterwards, to wit: on the day and year aforesaid, made and published his last will and testament in writing, and therein and thereby made and appointed the aforesaid *Jacob Lantz* and one *Jacob Unangst,* the executors thereof; by which will, the said *Peter Lantz* did, among other things, order and direct, and empower the said executors to sell for certain uses and purposes, in his said will specified, all his, the said testator's, real estate, of which he should die seised, at public vendue, within one year after the decease of him, the said testator, on the premises; and on the receipt, that is to say, after the receipt of the purchase money, or security for the same, to execute a good and sufficient deed or deeds, in fee simple, to the purchaser or purchasers thereof, as in and by the said will, more fully and at large appears. And the said *James M. Porter* further avers, that afterwards, to wit: on the 8th day of *June,* A. D. 1816, the said executors sold, among other lands, the aforesaid lands and tenements to one *Isaac Lantz,* as parcel of the estate whereof the said testator died seised, for a large sum, to wit: the sum of ten thousand and ninety-five dollars; and afterwards, to wit: on the 16th day of *November,* in the year last aforesaid, without having received the said ten thousand and ninety-five dollars, purchase money aforesaid, or any part thereof, and also without having received any security for the payment of the same, did seal and deliver to him, the said *Isaac Lantz,* a certain instrument indented, purporting to be a conveyance of the said lands and tenements from them, the said *Jacob Lantz* and *Jacob Unangst,* as executors of the said will of the said *Peter Lantz,* to him, the said *Isaac Lantz,* his heirs and assigns, for ever. And the said *James M. Porter* further avers, that afterwards, to wit: on the 2d day of *April,* A. D. 1822, the said purchase money, and every part thereof still remaining unpaid by him, the said *Isaac Lantz,* and not in any wise secured to be paid, or any part thereof, the said *Isaac Lantz,* by his certain indenture, in due form of law made, bargained, sold, conveyed, and confirmed unto the said *Jacob Lantz* and his heirs for ever, the said lands and tenements, and all the right, estate, and interest, which he, the said *Isaac Lantz* had, or might have had in or to the same, or any part thereof, by reason of the said instrument indented, first herein before mentioned or otherwise; by means of all which premises, the title or estate, if any, and also the interest which the said *Jacob Lantz* had at the rendition of the judgment upon which this *Scire Facias* is founded, or ever after, was, and is an estate and interest in trust, for the uses and purposes of the will aforesaid, and not an estate which might or may be charged by reason of the judgment aforesaid against him, the said *Jacob Lantz,* and this the said *James M. Porter* is ready to verify—wherefore, he prays judgment if the aforesaid plaintiffs ought to have execution for the debt and damages aforesaid, to be levied of the lands and tenements

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-
tenants.)

whereof he is returned a tenant, by reason of the judgment afore-
said against the said *Jacob Lantz.*

"And for a further plea in this behalf, the said *James M. Porter,*
by leave of the court, here for this purpose first had and obtained,
according to the form of the statute in such case made and provided,
says, that the said plaintiffs ought not to have execution of the debt
and damages aforesaid, to be levied of the lands and tenements
whereof he is returned a tenant; because, he says, that the said
*Peter Lantz* was seised of the lands and tenements aforesaid, and
being seised thereof, made and published his last will and testament,
and made the said *Jacob Lantz* and *Jacob Unangst,* the executors
thereof, and did therein and thereby confer certain powers and autho-
rities upon his said executors, in manner, form, and effect, as in the
pleading of the said *James M. Porter* herein before pleaded, is
more particularly set forth; and that, theretofore, to wit: on the 25th
day of *April,* A. D. 1814, the said *Peter Lantz* became, and was
indebted to a certain *John Lantz,* and to a certain *John Best,* Sen.,
now deceased, assignee of the said *John Lantz,* in a large sum,
namely, in the sum of six hundred dollars, lawful money of *Penn-
sylvania,* and being so indebted, and also seised as aforesaid, of the
lands and tenements aforesaid, afterwards, to wit: on the day and
year first aforesaid, died, to wit: at *Northampton* county aforesaid.
And the said *James M. Porter* further avers, that afterwards, to
wit: on the 19th day of *February,* A. D. 1816, the said *Jacob Lantz*
and *Jacob Unangst,* executors as aforesaid, proved, and took upon
themselves the burden of the execution of the said will of the said
*Peter Lantz,* to wit: at *Northampton* county aforesaid; and the
said *James M. Porter* further avers, that afterwards, to wit: on the
8th day of *June,* A. D. 1816, the said executors sold the said lands
and tenements, among others, as parcel of the estate of the said
*Peter Lantz,* to the said *Isaac Lantz;* and the said *Isaac Lantz*
purchased the same at the instance and request, and in trust and
confidence for the use of the said *Jacob Lantz,* executor as afore-
said, and not for the use of him, the said *Isaac Lantz.* And the
said *James M. Porter* further avers, that afterwards, to wit: on the
21st day of *January,* A. D. 1824, the said debt, which was before
that time due by the said *Peter Lantz* to the said *John Best,* Sen.,
(who, as well as the said *Peter Lantz,* were then deceased,) being
still due, and not in any way satisfied or paid, a certain *John Best*
and a certain *Jacob Best,* as executors of the said *John Best,* Sen.,
assignee as aforesaid, went into the Court of Common Pleas of the
county of *Northampton,* and then and there did implead the said
*Jacob Lantz* and *Jacob Unangst,* executors of the said *Peter
Lantz,* and according to the course of the said court, did declare
therein against the said *Jacob Lantz* and *Jacob Unangst,* upon
the said indebtedness of the said *Peter Lantz* unto the said *John*

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-
tenants.)

*Best*, Sen. as aforesaid. Whereupon, such proceedings were had
before the said court, that afterwards, to wit: on the 10th day of
*September*, A. D. 1824, the said *John Best* and *Jacob Best*, execu-
tors as aforesaid, recovered by the judgment of the said court against
the then legal representatives of the said *Peter Lantz*, the sum of
six hundred dollars debt, together with their damages and costs, &c.
which said judgment was rendered by the said court, to be levied
of the assets of the said *Peter Lantz*, as by the record of the said
judgment remaining in the said court fully appears. And the said
*James* further avers, that afterwards, to wit: at the Term of *Au-
gust*, A. D. 1824, of the said court, the said judgment being wholly
unsatisfied, and no part of the monies thereby recovered, paid, the
said *John Best* and *Jacob Best* prayed, and had of the said court,
the award of a certain writ of *Fieri Facias* upon the said judgment,
which said writ was directed to the sheriff of the said county, and
was made returnable to the Term of *November* of the said court, in
the year last aforesaid. And the said *James* further avers, that the
said *John Best* and *Jacob Best*, executors as aforesaid, for want of
sufficient personal assets of the said *Peter Lantz*, whereof the mo-
nies recovered by the said judgment could be made and levied, did
then and there direct the said sheriff to levy and execute the said
writ upon the said lands and tenements, sold as aforesaid to the said
*Isaac Lantz*, and purchased by the said *Isaac*, in trust as aforesaid,
and in pursuance of the said directions, the said sheriff did, by vir-
tue of the said writ, seize and take into his hands the said lands and
tenements, and afterwards, to wit: at the return day of the said writ,
made return of the said levy to the court aforesaid, as by the re-
cord of the said writ and return remaining in the said court more
fully and at large appears. And the said *James* further avers, that af-
terwards, to wit: at the said Term of *November* of the said court,
the said *John Best* and *Jacob Best*, executors as aforesaid, prayed
the said court to award upon the said judgment a certain writ of *Ven-
ditioni Exponas*. Whereupon, such proceedings were had, that af-
terwards, to wit: in the Term of *January*, A. D. 1825, of the said
court, the said court did award the said last mentioned writ, accord-
ing to the prayer of the said *John Best* and *Jacob Best*, executors
as aforesaid, which said writ was directed to the sheriff of the coun-
ty aforesaid, and commanded him to expose the said lands and tene-
ments to sale, and sell the same, and make his return thereof at the
next term of the said court, as by the said writ more fully and at
large appears; at which last mentioned term of the said court, to
wit: on the 30th day of *April*, in the said term, the said sheriff
made return of the said writ, among other things, that he had sold
the said lands and tenements to the said *James M. Porter*, for the
sum of two thousand dollars, which said sum, the said sheriff had
then and there to satisfy the said judgment of the said *John Best*
and *Jacob Best*, executors as aforesaid, as by the said writ he, the

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-tenants.)

said sheriff was commanded, which by the said last mentioned writ and return in the said court remaining, fully appears. And thereupon, the said sheriff did seal and deliver to the said *James,* his certain deed poll of bargain and sale, conveying the said lands and tenements to him, the said *James,* and his heirs, for ever, in consideration of the said sum of two thousand dollars, and in open court did acknowledge the same to be his deed, which are the same lands and tenements whereof he, the said *James,* is returned a tenant, and not diverse. By means whereof, the title, interest, and estate, which he, the said *Peter Lantz,* had in or to the said lands and tenements at the time of his decease, became and were transferred to, and vested in him, the said *James,* and this he is ready to verify. Wherefore, he prays judgment if the said plaintiffs ought to have execution of the debt and damages aforesaid, to be levied of the lands and tenements whereof he is returned a tenant as aforesaid.

"And for the further plea in this behalf, the said *James M. Porter,* by leave of the court, here for this purpose first had and obtained, according to the form of the statute in such case made and provided, says, that the said plaintiffs ought not to have execution of and for the debt and damages aforesaid, to be levied of the lands and tenements whereof he is returned to be a tenant, because, he says, that the said *Jacob Lantz,* in the said writ of *Scire Facias* named, or any other person or persons to the use of the said *Jacob Lantz,* at the time of the rendition of the judgment aforesaid, in the same writ mentioned, or ever after, had nothing in the said lands and tenements, or in any part or parcel thereof in the demesne, reversion or otherwise, which might be charged or bound by reason of the judgment aforesaid, in law or equity, and this he is ready to verify. Wherefore, he prays judgment if the said plaintiffs ought to have execution of the debt and damages aforesaid, to be levied of the lands and tenements whereof he is returned tenant as aforesaid.

"And for a further plea, &c., by leave, &c., the said *James M. Porter* pleads payment, with leave to give the special matters in evidence.

"And the said *Catherine Lantz,* in her proper person, comes and says, that upon the day of the issuing of the above writ of *Scire Facias,* viz. on the 28th day of *July,* A. D. 1827, she was tenant of the lands and tenements of which she is returned to be tenant, at the will of *James M. Porter,* Esq., (who also, by the return to the writ aforesaid, is returned to be tenant,) and of her, the said *Catherine,* and that she hath not, nor doth she claim to have any thing in the demesne, or in the reversion of the demesne of the lands and tenements aforesaid, nor had she, nor did she claim to have any thing therein on the day of the issuing of the said writ, or ever after, but altogether disavoweth and disclaimeth to have any right, title, estate, claim, or other interest whatsoever of, in, or to the same, save only an estate at will, as aforesaid.

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-
tenants.)

"And the said *Jacob Raub,* comes and says, that he was a tenant
of the lands and tenements whereof he is returned a tenant to *James
M. Porter,* Esq., (who also, by the return to the above writ of *Scire
Facias,* is returned to be tenant,) from year to year, namely, from
the 1st day of *April* next preceding the issuing of the writ aforesaid,
to the 1st day of *April* next thereafter ensuing, and so on from year
to year, at the will of the said *James,* and of him, the said *Jacob;*
and that he hath not, nor doth he claim to have any thing in the
demesne, or in the reversion of the demesne of the lands and tene-
ments aforesaid, with the appurtenances, or in any part or parcel
thereof, nor had he, nor did he claim to have any thing therein, on
the day of the issuing of the said writ, or ever after, but altogether
disavoweth and disclaimeth to have any right, title, estate, claim, or
other interest whatsoever of, in, or to the same, save only an estate
from year to year, as aforesaid."

The following notice of special matter was also given:—" That
*Peter Lantz* died seised of certain lands and tenements in *Williams*
township, among which were the lands in the possession of the per-
sons upon whom the writ has been served as the terretenants.

" That on the 19th of *January,* 1816, he made and published
his last will and testament, which after his decease, to wit: on the
19th of *February,* 1816, was duly proved in the register's office in
*Easton,* whereby he appointed *Jacob Unangst* and his son *Jacob
Lantz,* the executors thereof, and among other provisions contained
in his will, directed as follows: 'And as to all my real estate, situ-
ate in *Williams* township, aforesaid, or elsewhere, which I may die
seised of, I do hereby order and direct, that my said executors
herein after named, or the survivor of them, shall sell the same at
public vendue within one year after my decease, on the premises, in
the whole or in such parts as they shall think most advantageous for
my estate, and to such person or persons as may purchase the same,
or any part or parts thereof, and on the receipt of the purchase mo-
ney, or security for the same to their satisfaction, to execute good
and sufficient deed or deeds for the same, or any part or parts there-
of, to the purchaser or purchasers, to his or their heirs in fee sim-
ple; and the money arising from my personal estate, including mo-
ney and bonds, &c., together with the money arising from my real
estate after the same is sold,' (after deducting certain legacies before
mentioned,) ' the balance I give and bequeath in nine equal shares
and portions, to wit: to my son *Jacob* one-ninth;' (and so on to the
rest of his children, naming them, but providing as to his son *John's*
share as follows:) ' and the remaining ninth part, I order and direct
my executors to put out on good security, and the interest arising
therefrom yearly, to pay to my son *John* only, and to no other
person, during his life time; and after his decease, the principal to
his lawful issue, share and share alike. I do hereby expressly order
and direct, that one-third of the monies arising from the sale of my

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terretenants.)

personal and real estate, &c., as aforesaid, shall, in addition to what I have already given my said dear wife, be put on interest by my said executors, or the survivor, out of the first monies they shall receive, for the use of her, and the interest arising therefrom, shall be paid to her, yearly, during her life time; which said one-third part shall be deducted equally out of each of my said children's shares, for the purposes aforesaid.' The executors proved the will, and took out letters testamentary thereon.

"That the said executors, on the 8th of *June*, 1816, put up the real estate to sale, by vendue or outcry, when a tract of two hundred and thirteen acres, and allowance, in which are included the lands in possession of the person returned as terretenant, was bid in by *Isaac Lantz* for himself and *Jacob Lantz*, one of the executors; it being understood by them both, that *Jacob Lantz*, one of the executors, was to be a partner in the purchase: That a deed was made to the said *Isaac Lantz*, on the 16th of *December*, 1816, but the purchase money was not paid, nor was security taken for the payment thereof.

"That on the 17th of *March*, 1817, *Isaac Lantz* conveyed a moiety, or half part of the said land to the said *Jacob Lantz.*

" That the said *Jacob Lantz* and *Isaac Lantz*, by deed, dated the 18th of *March*, 1817, conveyed twenty-four acres and seventy perches, part of the said tract of two hundred and thirteen acres and allowance, to *George Lantz.*

" That on the 2d of *April*, 1822, the said *Isaac Lantz* conveyed to the said *Jacob Lantz*, the residue of the said tract of two hundred and thirteen acres, by deed, purporting to convey the whole of that residue.

"That *Jacob Lantz* and *Jacob Unangst*, the executors having failed to pay a debt due by their testator to *John Best* and *Jacob Best*, executors, &c. of *John Best*, Sen., deceased, who was assignee of *John Lantz*, on a bond, dated the 25th of *April*, 1814, for the payment of three hundred dollars on the 27th of *May*, 1817, a suit was brought in the Court of Common Pleas of *Northampton* county to *April* Term, 1824, against the said executors, to recover the amount.

" That pending the said suit, to wit: on the 24th of *February*, 1824, the said *Jacob Lantz* and *Jacob Unangst* were removed from their executorship by the Orphans' Court of *Northampton* county, and letters of administration, with the will annexed, were granted to *Jacob G. Raub* and *George Raub.*

" That on the 10th of *September*, 1824, judgment was obtained in the said suit against the administrators *de bonis non;* who had been substituted as defendants.

" That a *Fieri Facias* issued upon the said judgment under which the said premises of which the said *James M. Porter, Jacob*

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-
tenants.).

*Raub,* and *Catherine Lantz,* are returned terretenants, were le-
vied, and under a *Venditioni Exponas,* issued to *April* Term,
1825, sold by the sheriff to *James M. Porter,* to whom a deed was
made, and acknowledged on the 30th of *April,* 1825.

" That at the term to which the said *Venditioni Exponas* was
returnable, the said *Jacob Lantz,* by his counsel, moved to set
aside the sale: That the plaintiffs in this suit were privy to his con-
duct therein: That the purchaser then offered to the creditors, that
if they would pay off the debt due to *Best's* estate, secure what the
widow ought in justice to be entitled to out of the premises, and
make some provision for *John Lantz,* the creditors of *Jacob Lantz*
should have the property: That they considered on the proposition
for five days, and finally, said they would not assent to it, and agreed
that the sale should be confirmed.

" That the plaintiffs, when the premises were up for sale at one
time, procured *Frederick Willhelm* to bid on the property, to whom
it was struck off, but who never paid any money, and on the last
sale, they employed one *Peter Dennis* to bid on the same, and the
premises were struck off to him; but he not paying the money, the
premises were returned, sold to *James M. Porter,* the next highest
bidder: That the said *Frederick Willhelm* and *Peter Dennis,* were
both notoriously insolvent and had been employed to bid, in order
to delay and defeat the plaintiffs in the execution under which the
premises were up for sale."

To the defendant's plea the plaintiff replied as follows:—"And
the said *George Bruch,* who survived the said *George Ihrie,* Esq.,
as to the said plea of the said *James M. Porter,* by him first above
pleaded, says, that he, the said *George,* by reason of any thing by
the said *James* in that plea alleged, ought not to be barred from
having execution against him of the debt and damages aforesaid, to
be levied of the lands and tenements, whereof he, the said *James* is
returned tenant; because, he says, that the title or estate, and also
the interest which the said *Jacob Lantz* had in the said lands and
tenements at the rendition of the judgment upon which the said
writ of *Scire Facias* is founded, and ever after, was and is an estate
in fee simple in him, the said *Jacob Lantz,* and for the use of him,
the said *Jacob,* which might and may be charged by reason of the
judgment aforesaid, against the said *Jacob Lantz,* and not an estate
and interest in trust, for the uses and purposes of the will of the said
*Peter Lantz,* deceased, in manner and form as the said *James* has
in his said plea, by him first above pleaded alleged, and this he, the
said *George,* prays may be inquired of by the country, &c.

"And the said *George Bruch,* who survived the said *George Ihrie,*
Esq. as to the said plea of him, the said *James M. Porter,* by him
secondly above pleaded, says, that he, the said *George,* by reason of
any thing by the said *James* in that plea alleged, ought not to be
barred from having execution against him of the debt and damages

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-
tenants.)

aforesaid, to be levied of the lands and tenements whereof he, the
said *James*, is returned a tenant; because, he says, that the said
*Jacob Lantz* and *Jacob Unangst*, executors of the last will and
testament of the said *Peter Lantz*, deceased, at the day and time
in the plea of the said *James*, by him secondly above pleaded,
mentioned, by virtue of the power and authority given to them by
the will aforesaid, sold the said lands and tenements among others,
as parcel of the estate of the said *Peter Lantz*, deceased, to *Isaac
Lantz*, and the said *Isaac Lantz* purchased the same to be held
by him, the said *Isaac*, in fee simple, and for the use of him, the
said *Isaac*, and not in trust and confidence for the use of the said
*Jacob Lantz*, executor as aforesaid, as by the plea aforesaid, of the
said *James*, by him secondly above pleaded is alleged; and the said
*George Bruch*, in fact, says, that the said *Isaac Lantz* being so
seised of the lands and tenements as aforesaid, he, the said *Isaac*,
and *Elizabeth*, his wife, afterwards, and before the rendition of the
judgment aforesaid, to wit: on the 2d day of *April*, in the year of
our Lord, one thousand eight hundred and twenty-two, at the
county aforesaid, by their certain indenture, under their hands and
seals, duly executed for the consideration therein mentioned, did
grant and convey the same to the said *Jacob Lantz*, his heirs and
assigns, to his and their only proper use, benefit, and behoof, for
ever, as by reference to the said indenture, will more fully and at
large appear. And the said *George Bruch*, in fact, further says, that
the lands and tenements conveyed by the said *Isaac Lantz*, and
*Elizabeth*, his wife, as aforesaid, to the said *Jacob Lantz*, are the
same lands and tenements of which the said *James M. Porter* is
returned a tenant, and not diverse. And the said *George Bruch*,
in fact, further says, that by means of the said last mentioned in-
denture, by which the lands and tenements aforesaid were granted
and conveyed to the said *Jacob Lantz*, as aforesaid, all the title,
interest, and estate, which he, the said *Peter Lantz* had in or to
the said lands and tenements at the time of his decease, became, and
were transferred to, and vested in the said *Jacob Lantz*, in fee
simple, and for the use of him, the said *Jacob*, and continued to be
so vested in the said *Jacob Lantz* at the time of the rendition of
the judgment aforesaid, and from thence hitherto still continue to
be so vested in the said *Jacob*, and not in the said *James M. Por-
ter*, and this the said *George* prays may be inquired of by the
country, &c.

"And the said *George Bruch*, who survived the said *George
Ihrie*, Esq., as to the said plea of him, the said *James M. Porter*,
by him thirdly above pleaded, says, that he the said *George*, by
reason of any thing by the said *James*, in that plea alleged, ought
not to be bound from having execution against him of the debt and
damages aforesaid, to be levied of the lands and tenements whereof
the said *James* is returned a tenant; because, he says, that he, the

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-tenants.)

said *Jacob Lantz*, at the time of the rendition of the judgment in the writ of *Scire Facias* above-mentioned, and long after, was, and yet is seised of the said lands and tenements whereof the said *James* is returned a tenant as aforesaid, and every part and parcel thereof in his demesne as of fee, as by the return of the writ aforesaid is above supposed, and this he prays may be inquired of by the country.

"And the said *George Bruch*, who survived the said *George Ihrie*, Esq. as to the said plea of the said *James*, by him fourthly above pleaded, replies, '*non solvit*,' and this he prays may be inquired of by the country.

"And because the said *Catherine Lantz* disavoweth and disclaimeth to have any right, title, estate, claim, or other interest whatsoever of, in, or to the said lands and tenements, save only an estate at will, as in her disclaimer is above-mentioned, therefore, upon the prayer of the said *George Bruch*, it is considered, that the said *George* have execution against her, the said *Catherine,* for the debt and damages aforesaid, to be levied of the lands and tenements whereof the said *Catherine* is, as aforesaid, returned tenant, but let the execution of the said judgment stay until the pleas aforesaid, between the said *James M. Porter* and the said *George Bruch* be determined, &c.

"And because the said *Jacob Raub* disavoweth and disclaimeth to have any right, title, estate, claim, or other interest whatsoever of, in, or to the said lands and tenements, save only an estate at will, as in his disclaimer is above-mentioned, therefore, upon the prayer of the said *George Bruch*, it is considered, that the said *George* have execution against him, the said *Jacob Raub*, for the debt and damages aforesaid, to be levied of the lands and tenements whereof the said *Jacob* is, as aforesaid, returned tenant, but let the execution of the said judgment stay, in the mean time, until the pleas aforesaid between the said *James M. Porter*, and the said *George Bruch*, who survived the said *George Ihrie*, Esq. be determined, &c."

On the trial, the plaintiff gave in evidence, the record of a judgment, No. 124, *August* Term, 1822, *George Ihrie*, Esq., and *George Bruch* v. *Jacob Lantz*, D. S. B., one thousand seven hundred and eleven dollars and ten cents; judgment confessed the 17th of *August*, 1822, by *Peter Ihrie*, Jr. Esq., attorney of the defendant by warrant constituted:

Also a revival of this judgment by amicable *Scire Facias*, No. 11, *November* Term, 1824—20th *September*, 1824, judgment revived by agreement:

Also a *Fieri Facias* to *November* Term, 1824, No. 69, issued the 20th *September*, 1824. Real debt nine hundred and and sixty-three dollars and sixty-two cents; interest from the 20th of *September*, 1824. Returned by the sheriff, "levied as *per* inventory." This in-

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-
tenants.)

ventory was "all the right, claim, and interest of the defendant in,
and to the grain in the ground," &c.

The plaintiff then gave in evidence the last will and testament of
*Peter Lantz*, deceased, dated *January* 19th, 1816, and proved be-
fore the register, &c; of *Northampton* county, on the 19th day of
*February*, 1816. The material parts of the will are as stated in the
notice of special matter.

The plaintiff then called *Bernard Unangst* as a witness, who
being sworn, testified, "that he was the clerk at the vendue of the
real estate of *Peter Lantz*, deceased: That the paper shown to him
was the conditions of that sale: That the conditions were read by
him: That the sale was held on the premises, and that *Isaac Lantz*
became the purchaser."

The plaintiff then gave in evidence the conditions of the sale,
held on the 8th day of *June*, 1816, and an acknowledgment sub-
joined thereto, dated the same day, signed by *Isaac Lantz*, stating,
that he had purchased the property for ten thousand and ninety-five
dollars. The conditions and acknowledgment were as follows:—

"*Public Vendue,*

"Of a certain messuage, tenement, and plantation, situate in
*Williams* township, in the county of *Northampton*, and state of
*Pennsylvania*, and adjoining lands of *John Bloom*, *Peter Sailer*,
*John Sellers* and others, and containing two hundred and thirteen
acres and allowance, agreeably to the courses and distances of a cer-
tain patent from the commonwealth of *Pennsylvania*, dated the 26th
of *September*, A. D. 1788, granted to *Nicholas Lantz*, the father
of the said *Peter Lantz*, deceased.

"*The conditions of sale are as follows, to wit:—*

"The highest bidder to be the purchaser. One-third of the pur-
chase money to be paid on the 1st day of *April* next. The residue
to be paid in three equal yearly payments, without interest—the 1st
of said yearly instalments to be made on the 1st of *April*, 1818,
1819, 1820. To be secured by bonds and mortgage, or such other
security as shall be demanded by the executors. A free deed is to
be executed for the premises on the payment of the first payment,
to wit: on the 1st day of *April* next, and possession of the premises
on the said day, or on any other day prior to the same, if the said
executors shall think it proper.

"*Jacob Unangst,* ⎱
"*Jacob Lantz,* ⎰ Executors."

"*Williams* township, *June* 8th, 1816."

"I do hereby acknowledge that I have purchased the above de-
scribed premises at the sum of *ten thousand and ninety-five dol-*

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-
tenants.)

*lars,* on the conditions above written. Witness my hand, *June* 8th,
1816.

"*Isaac Lantz.*

" Witness, ⎰ *Bernard Unangst,* Jr.
⎱ *Jacob Deemer.*"

The plaintiff then offered· in evidence, a deed, dated *November*
16th, 1816, from *Jacob Unangst* and *Jacob Lantz,* executors, &c.
of *Peter Lantz,* deceased, to *Isaac Lantz,* conveying the premises
in question as two hundred and twelve acrés and one hundred and
sixty perches, for the consideration of ten thousand and·ninety-five
dollars; to the admission of which in evidence, the terretenant ob-
jected, on the ground that the plaintiff must first show the due exe-
cution of the power to sell given to the executors of *Peter Lantz,*
deceased, by proving that the purchaser, *Isaac Lantz,* either paid
the purchase money, or gave security for the same, previous to the
execution of the deed. But his honour being of opinion, that the
acknowledgment of the executors in the deed, of the paying and
securing of the purchase money, was *prima facie* evidence of that
fact, so as to admit the deed in evidence, permitted it to be read.

The deed was acknowledged on the 16th of *December,* 1816, be-
fore *George Ihrie,* Esq., *but not recorded.*

The plaintiff then gave in evidence a deed, dated the 2d of *April,*
1822, from *Isaac Lantz* and his wife, to *Jacob Lantz,* conveying
the tract in dispute as two hundred and ten acres and eighty perches,
for the consideration of three thousand five hundred dollars, acknow-
ledged the same day before *George Ihrie,* Esq., and recorded on
the 30th of *October,* 1822.

The plaintiff then gave in evidence a deed from *Isaac Lantz* to
*Jacob Lantz,* dated the 19th of *March,* 1817, conveying the moiety
of the tract for the consideration of five thousand and forty-seven
dollars, acknowledged the same day before *George Ihrie,* Esq. On
this deed no receipt was endorsed, nor was it recorded.

The· plaintiff next offered a receipt, purporting to be signed by
*Catherine Lantz,* dated *September* 18th, 1816, to *Jacob Lantz*
and *Jacob Unangst,* executors of *Peter Lantz,* deceased, for one
hundred dollars, bequeathed to her by the will.· This was objected
to by the terretenant, on the ground, that receipts for monies paid
to a third person are not evidence, but the persons themselves
should be produced. The objection was, however, overruled, and
the receipt read.

The plaintiffs then called *Philip B. Unangst* as a witness, who
being sworn, proved his signature to four receipts, and further said,
·" I did· not receive the money mentioned in these receipts, but it
answered the same purpose. I bought a lot of *John Bloom,* and
he lent the money to *Isaac* and *Jacob Lantz.* I did not get any
money except for the first receipt, and that was out of the personal

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-
tenants.)

property, and is dated *May* 30th, 1817. The other three were paid
on the land."

The three receipts were then read, and were as follows:—

" 31st of *March,* 1818.—*Philip B. Unangst* to *Jacob Lantz,*
for two hundred and forty-four dollars and fifty-nine cents. 1st of
*April,* 1819.—Same to same, two hundred and forty-four dollars
and fifty-nine cents. 1st of *April,* 1820.—Same to same, two hun-
dred and sixty-five dollars and eighty-six cents."

On being cross-examined, the witness said, "I have not received
any security for that part of my share in my father-in-law's estate,
falling due after the death of the old woman."

On his re-examination, he added, "I have the full amount of the
share to which I am entitled at this time."

The plaintiff then called *Christopher Heller,* who proved his
signature to three receipts, and testified, "I received all the money.
I have received no security for what falls due on the land on the
death of the old woman. I never asked for any."

The receipts were then read as follows:—

" 30th of *April,* 1818.—Receipt, *Christopher Heller* to *Jacob
Lantz,* two hundred and forty-four dollars and fifty-nine cents.
3d of *May,* 1819.—Same to same, two hundred and forty-four dol-
lars and fifty-nine cents. 27th of *May,* 1820.—Same to same,
two hundred and fifty-six dollars and sixty-eight and a half cents."

The witness then stated, "I have received all that is coming to
me at this time out of my father-in-law's estate."

The plaintiff then called *George Lantz,* who proved his signature
to three receipts, which were given in evidence as follows:—

"1st of *April,* 1818.—*George Lantz* to *Jacob Lantz,* two hun-
dred and forty-four dollars and fifty-nine cents. 1st of *April,*
1819.—Same to same, two hundred and forty-four dollars and fifty-
nine cents. 26th of *February,* 1821.—Same to same, two hun-
dred and fifty-six dollars and sixty-eight and a half cents."

Being cross examined, the witness stated, "I got this money. I
got a piece of the land. The land was included in the receipts. I
paid for the land by giving the receipts. I purchased of *Jacob* and
*Isaac Lantz.* I am satisfied for my share to this day. They gave
me no security for what comes due after the death of my mother,
nor did I ask for any. I am the same *George Lantz* who took the
benefit of the insolvent laws. The land I got was part of my father's
land."

The plaintiff then called *Nathaniel Michler,* Esq., who testified,
"that he signed three receipts, (shown to him,) as a witness, and
saw *Catherine Lantz* sign them: That he did not recollect seeing
any money paid."

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-tenants.)

The receipts were then read, as follows:—

16th of *April*, 1819.—*Catherine Lantz* to *Jacob Lantz* and *Isaac Lantz*, for two years' interest, due the 16th of *April*, 1818, and 16th of *April*, 1819, five hundred and seven dollars and twenty-two cents. 16th of *April*, 1820.—Same to same for one year's interest due that day, two hundred and fifty-three dollars and sixty-one cents."

The plaintiff then called *Peter Lantz*, who proved his signature to a receipt, which was read as follows:—

" 14th of *April*, 1818.—*Peter Lantz* to *Jacob Lantz*, for two hundred and forty-four dollars and fifty-nine cents."

In relation to this receipt, the witness stated, "I got a part of this in money and a part in land. *Jacob* and I purchased a piece of land together of *George Ihrie*, Esq. I afterwards bought *Jacob* out, and the money went on this."

An acknowledgment, dated the 21st of *January*, 1825, by *Peter Lantz*, that on or about the 1st of *April*, 1819, he received of *Jacob Lantz*, two hundred and forty-four dollars and fifty-nine cents; and on or about the 1st of *April*, 1820, he received two hundred and fifty-six dollars and forty-eight and a half cents, was also given in evidence.

The witness then proceeded, "I am satisfied for my share of my father's estate due at this time."

On being cross-examined, he said, "I have received no security for my part which falls due on my mother's death. I never asked for any."

*Jacob G. Raub* being called by the plaintiff, testified to three receipts, which were given in evidence as follows:—

" 31st of *March*, 1818.—*Jacob G. Raub* to *Jacob Lantz*, two hundred and forty-four dollars and fifty-nine cents. 1st of *April*, 1819.—Same to same, two hundred and forty-four dollars and fifty-nine cents. 2d of *April*, 1823.—Same to same, two hundred and twenty-five dollars."

The witness further stated, "I got the money stated in these receipts. I got no security for what has yet to become due on the old woman's death. I am not altogether paid—there are about sixty or seventy dollars coming to me yet. I spoke to *Jacob Lantz* several times for security for my share coming due after the old woman's death. He said it was secured on the land—that the whole was secured, interest and all."

The plaintiff then offered in evidence the account of *Jacob Lantz* and *Jacob Unangst*, executors of *Peter Lantz*, deceased, exhibited the 16th of *April*, 1817, to which the terretenant objected; but it being stated, that it was offered merely *"for the purpose of show-*

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-tenants.)

*ing, that the executors had settled the estate as they ought to have done,"* it was admitted by the court, and read to the jury.

By this account, it appeared that the balance then due and for distribution, amounted to   -   -   -   -   -   $5626 44½
Due on the 1st of *April,* 1818,   -   -   -   2243 33⅓
Due on the 1st of *April,* 1819,   -   -   -   2243 33⅓
Due on the 1st of *April,* 1820,   -   -   -   2243 33⅓

*Isaac Lantz* being called by the plaintiff, testified, "My part re-mained in the land; I had purchased the land."

Being cross-examined, he said, "I purchased it alone. It was understood, that when I purchased the land, *Jacob* was to have the half. I gave a bond for the whole, and gave *George Bruch* and *George Lerch* as securities; and when I gave up the land to *Jacob Lantz,* I told him I must have my bond. We came to Esquire *Ihrie's.* I said I would have my name out, and either Esquire *Ihrie* or I took my name out—tore it out. *George Bruch,* the plaintiff, was one of the sureties. This was not when the first deed was made. I do not know when it was. I did not receive any money. I lost my whole portion in it. I did not pay any money out. *George Ihrie* was present when the bond was destroyed. *Jacob Lantz* was present. I do not know whether I told *George Bruch* or not. I saw that bond last at Esquire *Ihrie's.* I have it not. I tore my name out of the bond; it was torn out, but whether Esquire *Ihrie* did it or I did, I cannot say. There was no other security given."

The plaintiff then produced and gave in evidence, a release, dated the 25th of *November,* 1822, given by *Isaac Lantz* to *Jacob Lantz* and *Jacob Unangst,* of all interest in the estate of *Peter Lantz,* deceased. And thereupon the plaintiff closed for the present.

The terretenant then gave in evidence, the record of a suit in the Court of Common Pleas of *Northampton* county, of *April* Term, 1824, No. 4—the docket entries of which were as follows:—

"*Porter,* { *John Best* and *Jacob Best,* Executors of *John Best,* Sen., deceased, who was assignee of *John Lantz,* *vs.* *Jacob Lantz* and *Jacob Unangst,* Excutors, &c. of *Peter Lantz,* de-ceased. } *Summons,* Debt $600, is-sued *January* 24, 1824. *Summoned.*"

"*Ihrie,*

"*Fi. Fa.* To *Novem-ber,* 1824. 78. } "And now, *September* 10th, 1824, by agreement filed, *Jacob G. Raub* and *George Raub,* adm'ors de bonis non, with the will annexed of *Peter Lantz,* deceased, are substituted as defendants in the room and stead of *Jacob Lantz* and *Jacob Unangst,* the executors of the last will and testament of the deceased, who have

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terretenants.)

been dismissed from their executorship, and that judgment be entered for the plaintiff in the above action. The said judgment not to be considered as charging the said administrators with assets. This agreement was witnessed by *George Wolf*, Esq."

The *Fieri Facias* to *November* Term, 1824, No. 78, was directed "to be levied of the goods and chattels, lands and tenements, which were of *Peter Lantz*, late, &c., deceased, in the hands of *Jacob G. Raub* and *George Raub*, adm'ors de bonis non, with the will annexed of said *Peter Lantz*, deceased." It issued for a debt of six hundred dollars, and damages, (or costs,) six dollars and sixty-one cents. It was endorsed "Real debt three hundred and thirty-two dollars and twenty-five cents. Interest from the 10th of *September*, 1824."

Upon the terretenant's counsel being about to read to the jury the levy and return of the sheriff to the beforementioned *Fieri Facias,* the counsel for the plaintiff objected, on the ground, that the property was no longer the estate of *Peter Lantz*, deceased, but had already been sold to pay debts and legacies; but the court, after argument, admitted them in evidence, reserving the point, and the levy and return were read as follows:—

"By virtue of the writ I have seized and taken in execution a certain tract of land, situate in *Williams* township, *Northampton* county, adjoining lands of *Peter Lantz, Henry Krutz, Peter Sailor, Peter Zeller* and others, containing two hundred and ten acres, be the same more or less, on which is erected a dwelling house, part stone and part frame, a stone smoke house, log barn, a frame barn, a log stable, wagon house, cider press, and other the appurtenances, which remains in my hands unsold for want of buyers." So answers *John Carey*, Jr., sheriff.

The terretenant then gave in evidence an agreement, attached to the *Fieri Facias,* and return as follows:—

"*John Best* and *Jacob Best*, Executors, &c. of *John Best*, deceased.
  *vs.*
*Jacob G. Raub* and *George Raub*, adm'ors de bonis non, with the will annexed of *Peter Lantz*, deceased.

"*Fi. Fa.* To *November* Term, 1824.

"To *John Carey*, Jr. Esq., Sheriff.

"We hereby consent to a condemnation of the premises, levied on in this case.

"*Jacob G. Raub,*
"*George Raub.*"

A *Venditioni Exponas* issued to *January* Term, 1825, No. 46, upon which the sheriff returned, "Advertised—up for sale, and

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-
tenants.)

struck off to *Peter Dennis,* for two thousand five hundred and thirty
dollars; the money not paid. Unsold for want of buyers."

An *Alias Venditioni Exponas* issued to *April* Term, 1825,
No. 37.

*April* 26th, 1825. On motion of Mr. *Wolf,* rule to show cause
why the sale shall not be set aside.

*The following were the exceptions to the sale:—*

" 1. That the premises were sold under a judgment of three hun-
dred and thirty-two dollars and twenty-five cents, with interest
from the 10th of *September,* 1824, at the suit above-mentioned, the
amount of which judgment, *Peter Shively,* one of the creditors of
*Jacob Lantz,* in whom the title to the premises sold under the
above writ is vested, offered to pay to the plaintiffs, before the sale
of the property, provided they would transfer to him their judgment,
which they refused to do.

" 2. That the creditors of *Jacob Lantz,* by obtaining the above
judgment, would have it in their power to sell the property, in
such a manner as to enable them to secure their respective claims
against the said *Jacob Lantz,* in as much as they would have it in
their power to sell the property on credit, and by that means cause
it to produce a much larger price than that at which it has been sold
by the sheriff.

" 3. That the creditors of *Jacob Lantz* are willing at this time
to discharge the debt, interest, and costs, due to the plaintiffs above
named, provided they will transfer their judgment.

" 4. That the property has been sold at a great sacrifice, it con-
sisting of two hundred and ten acres of valuable land, with valuable
improvements, and having been sold for two thousand and ten dol-
lars, which is not more than half its value, the said property having
been sold to *Jacob Lantz,* some years since, for ten thousand and
ninety-five dollars.

" 5. That *Frederick Willhelm,* the purchaser at sheriff's sale, is
unable to comply with the terms of the sale, and the sheriff is about
to return the property as sold to the next bidder, *James M. Porter,*
Esq., at the sum of two thousand dollars, which is altogether an
inadequate price.

*"Jacob Lantz.*

" Sworn and subscribed, *April* 26th, 1825, before

*"George Ihrie,* J. P."

*April* 30th, 1825, the rule was discharged; and on motion of Mr.
*Porter,* the court appointed *Philip H. Mattes,* Esq. commissioner,
to report the facts in the case, together with the nature and amount
of the liens, &c.

The terretenant then offered to give in evidence the report made

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-
tenants.)

by Mr. *Mattes,* in pursuance of his appointment, which was ob-
jected to, and rejected by the court.

The terretenant then gave in evidence a deed from *John Carey,*
Jr., sheriff of *Northampton* county, to *James M. Porter,* for the
premises in question, sold under the *Alias Venditioni Exponas*
above-mentioned. The deed was dated the 30th of *April,* 1825, was
acknowledged in open court, and recorded the same day.

The terretenant then gave in evidence the record of the proceed-
ings of two justices and a jury, under the act of assembly to enable
purchasers at sheriff's sale to obtain possession, by which *Jacob
Lantz* was evicted from the premises, and possession of them de-
livered to *James M. Porter,* on the 9th day of *August,* 1825.

The defendant thereupon called *Jacob G. Raub* as a witness on
his behalf, who testified: " I was present in the court house when
this property was up for sale. Mr. *Porter* got up after the condi-
tions of sale were read, and said, the sale was a fair one, and the
title would be a good one, and that he would give two thousand
dollars for it. The sheriff took his bid—a bid was made above him
of five or ten dollars. *Frederick Willhelm;* I think, came forward
and signed the conditions. I know *Frederick Willhelm;* he was
worth nothing then, and is worth nothing now. *Peter Dennis* bid
it off once—he is worth nothing, and was worth nothing then.
There were no other bidders. *Dennis* was the highest bidder."

On his cross-examination, he said, " I believe *Frederick Will-
helm* signed the conditions. I saw him come forward, and I be-
lieve he did sign them. Mr. *Porter* was next to the highest bidder
both times. Mr. *Porter* said, the sheriff should not delay the pro-
perty on account of such a purchaser, who was not able to comply
with the conditions: That if he did not comply, he was ready to
take it at his bid. I live on the property as tenant under Mr. *Por-
ter.* There is no written lease between Mr. *Porter* and myself."

It was admitted by the counsel for the plaintiff, that when the
motion to set aside the sale was made, Mr. *Porter* offered in open
court, that if the creditors of *Jacob Lantz* would secure to the wi-
dow whatever was the value of one-third of the land, to be enjoyed
during her life, and pay off the debt of *Best,* the sale might be set
aside or returned to any one else.

The defendant then called *Philip H. Mattes* as a witness, who
being sworn, testified: "I was appointed auditor under the suit of
*Best's* executors against *Lantz,* on the 30th of *April,* 1825. It
was stated by some of the creditors, that when the property was
sold to *Isaac Lantz,* the executors had taken a bond, with *George
Bruch* and *George Lerch,* sureties, for the payment of the wi-
dow's interest: That this bond was given up when *Jacob Lantz*
purchased of *Isaac Lantz.* After I had drawn up my report, I
saw Mr. *Jacob Lantz,* and he stated explicitly, that no bond, nor
any security whatever, had been taken for any part of the purchase

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-tenants.)

money. Previous to this, I had .been one of the auditors to settle the administration account. These receipts were produced charged against the widow. The widow stated she had never received the full amount of her interest—and this was admitted. She had lived in the family and had agreed to give a receipt in full: That though the receipt on its face was for a sum of money, yet that was not the actual fact: That she had given these receipts to aid her sons. This *Jacob Lantz* admitted. Another settlement was made on the 21st of *September*, 1823, and *Jacob Lantz* gave his note for ninety-six dollars and thirty-one cents, due her in 1822—the year 1823, was not taken into consideration."

The defendant next called *Jacob Raub* as a witness, who testified:—"Mrs. *Lantz* has lived on the property since Mr. *Porter* got it. She has paid no rent. Mr. *Porter* has furnished her money, grain and fire wood. She occupies the stone part of the house—the best part of it."

Being cross-examined, he stated: "She has lived there ever since her husband's death. Towards the last she complained very much, and I helped her along. Near about the time of the sale, she was very scantily kept. She had no shoes and no money. Shortly after Mr. *Porter* purchased, he bought a pair of shoes, and sent them to her. Since the sale, she has lived comfortably."

The defendant thereupon called *George Raub* as a witness, who being sworn, testified:—"My wife is one of the heirs of *Peter Lantz*, deceased. She has had some of her share, but not much, very little. She received some before I was married. When I got a bond, there was rising eight hundred dollars due. I got a bond from *Jacob Lantz, George Bruch,* and *George Ihrie,* Esq. I have never received any money on this bond. Payment has been refused on that bond. I put it in the hands of counsel for collection. The bond was for the money now due—it does not include that coming due after the widow's death. There is no security for that."

On being cross-examined, the witness added:—" I consider myself perfectly safe with the securities. The reason they refused to pay was, that the land was taken away from *Jacob.* This is the bond:

"16th of *August*, 1822.—Bond, *Jacob Lantz, George Bruch,* and *George Ihrie,* to *George Raub;* penalty one thousand seven hundred and eleven dollars and ten cents, conditioned to pay eight hundred and fifty-five dollars and fifty-five cents, with interest."

The defendant thereupon called *Jacob Unangst* as a witness, who being sworn, testified:—"When the property was sold to *Isaac Lantz,* there was no money paid, nor security given immediately. The will said, we might sell it in whole or in piece. We sold altogether. It was not understood, that my son-in-law should have a piece of it. I know nothing of any bargain between *Jacob* and *Isaac.* I never received any money from the land. I know

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-
tenants.)

of no security given, to secure the interest of the widow and *John Lantz.* I own no property at this time. *Jacob Lantz* owns no-thing as I know. We live close together."

On his cross-examination, he testified, "I live near the old Place not half a mile. As much as I know, she had nothing to complain of while *Jacob Lantz* lived there. She had every thing enough. At first I was frequently there, but latterly I was sick. *Jacob* did every thing. There was no security given when *Isaac* first pur-chased. I do not know of any bond being given. I had none. I had nothing in my hands. *Jacob* had all. Esquire *Ihrie* did all the writing for us. *Isaac* gave a bond. I think he gave it to us. No other person joined in the bond. I can't recollect that he gave any security. The people thought the land was high, and so did I."

The plaintiff then, as repelling testimony, called *Jacob Best* as a witness, who, being sworn, testified: "*Jacob Lantz* called on me, and asked whether my father was willing to take a bond from his own hand for the half, and sue *Peter Sailor* for the half. My fa-ther was living, and *Sailor* had been sold out by the sheriff. I told him there was nothing to be had from *Sailor,* and if we sued, we had to sue both. They paid on the interest till about two years before we sued. We did not receive any interest after my father's death. Just before the sale, *Peter Shively* came and asked if I would sell the bond to him or not. I told him we had employed Mr. *Porter,* and I must ask him. Mr. *Porter* said I should not sell it: that they wanted to injure the widow. *Shively* said he would pay it almost any time, if I would let him have the bond. I can-not remember that the sheriff took an assignment of the bond. *Peter Shively* was able to pay."

When cross-examined, he said, *Shively* did not produce any mo-ney. *Shively* wanted me to assign the bond—he would buy it and pay the money for it. *Peter Dennis* is good for nothing—he has taken the act a couple of times. Mr. *Porter* said that by getting such poor bidders, they would prevent a sale if they could. Mr. *Porter* said that if I assigned the bond, it would turn the old lady out of house and home, and that I should not assign the bond. I afterwards saw *Shively,* and told him that Mr. *Porter* said I should not do it. *Shively* did not give any reason for wanting the bond—he said he wanted to buy it."

The plaintiff then exhibited a list of judgments against *Jacob Lantz,* showing them to amount to two thousand four hundred and six dollars and seventeen cents.

The plaintiff then called *Abraham Sigman,* who, being sworn, testified: "I was in the court house when the property was bid off by *Wilhelm. George Ihrie,* Esq., was in when the property was put up for sale."

The court charged the jury, that under this evidence the plaintiff was entitled to recover.

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terretenants.)

The following were the reasons assigned for a new trial:—

"1. That the Court erred in admitting in evidence the deed dated the 16th of *November,* 1816, from *Jacob Lantz* and *Jacob Unangst,* executors, &c., of *Peter Lantz,* deceased, to *Isaac Lantz,* and the deeds from *Isaac Lantz* to *Jacob Lantz.*

"2. The Court erred in admitting in evidence, 1. The receipt of *Catherine Lantz.* 2. The receipts of *Philip B. Unangst.* 3. The receipts of *Christopher Heller.* 4. The receipts of *George Lantz.* 5. The receipts of *Peter Lantz.* 6. The receipts of *Jacob Raub.* 7. The release of *Isaac Lantz,* and all the evidence tending to show payments by *Jacob* or *Isaac Lantz* to the legatees.

"3. That the Court erred in charging the jury, that *Jacob Lantz* had an interest in the land on which the plaintiff's judgment was a lien at the time of the rendition of the original judgment in this cause, and that under the evidence, the plaintiff was entitled to recover.

"4. That the Court should have charged the jury, that under the evidence in the cause, on the conveyance of the lands by *Isaac Lantz* to *Jacob Lantz, Jacob Lantz* took the same only upon the trusts, and for the purposes specified in the will of the testator *Peter Lantz.*

"5. That the Court should have charged the jury, that under the sheriff's sale, *James M. Porter,* the terretenant, acquired all the estate of *Peter Lantz,* the testator, in the premises, and was, therefore, entitled to a verdict in his favour."

*Tilghman* and *J. Sergeant,* for the appellant.—*Jacob Lantz* had no title to the lands attempted to be affected by the judgment against him. His execution of the power in the will of *Peter Lantz,* under which his pretended title is derived, is totally defective, and vested no interest in him. Powers must be strictly pursued in their execution, particularly where the sale is for the payment of legacies. The want of signing, sealing, attestation, enrolling the prescribed number of witnesses, where these things are required by the instrument creating the power, will avoid the execution of it. *Willes,* 109. 2 *Preston Abs. of Titles,* 249, 262, 267, 273, 279. Here the power was to sell in a mode indicated by the testator, for cash or security. *Isaac,* the brother of *Jacob,* nominally, became the purchaser, for the benefit of *Jacob,* the executor and trustee. No money was paid; no mortgage or security of any kind given; and, consequently, all that was pretended to have been done in execution of the power was void. The sale was not only in contradiction to the directions of the will, but of the conditions of sale of the executors themselves, according to which, one-third of the purchase money was to be paid on the 1st of *April* following, and the residue in three equal annual payments, secured by bond and mortgage,

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-
tenants.)

or such other security as the executors might demand.   It is true,
to a certain extent, that the character of the security was left to the
discretion of the executors, but they exercised no discretion, took
no security; and security of some kind was indispensable to a valid
execution of the power.   The bond taken was cancelled, without any
equivalent, which was inequitable and fraudulent.

A still greater objection to the sale exists.   The executor pur-
chased under cover, for his own benefit; and, therefore, cannot hold
the property, for equity never permits a trustee to become a pur-
chaser of the trust estate, without the consent of the *cestui que*
*trust.*  It is the contrariety of interest between the buyer and seller
which produces a fair price, which cannot be attained when the
same person is both buyer and seller.   Such a deed as that under
which *Jacob Lantz* purchased, like a voluntary deed, is good
against the parties to it, but void against every body else.   There is
no case to show, that a trustee may purchase from himself, even if
he does not make advantage by the purchase.   The receipts given
in evidence, were for payments subsequent to the sale under which
the plaintiff claims, and with which the defendant had no concern.
They did not amount to a ratification of the execution of the power,
for a man can ratify only for himself, and not for others.   The effect
of treating them as a ratification, will be to prejudice creditors by
a family arrangement, which can never be permitted.   The defen-
dant certainly never ratified the sale, and the act of no one else
could bind him.   That he did so actually, is not pretended, and
there is nothing to show, that he did so constructively.   Even if
the original sale had been to *Isaac* for his own benefit, yet when
*Jacob* afterwards purchased of him, he took the estate subject to all
the trusts which attached to it in the hands of the executors, as if
there had been no sale. *Boon* v. *Smith,* 1 *Vern.* 60, 61. 2 *Preston*
*Abs.* 231. 2 *Madd. Ch.* 127. 2 *Eq. Ca. Ab.* 384.

It is not necessary to inquire whether the will gave a power to
sell for payment of debts.   If it did not, the land remains charged,
for a sale under a power to pay legacies, does not put the estate be-
yond the reach of creditors. *Hannum* v. *Spear,* 2 *Dall.* 291. *S.*
*C.* 1 *Yeates,* 553.   This is emphatically the case, where the pur-
chaser is the executor, who has paid nothing.   He holds it subject
both to debts and legacies.   This he did before the sale, and he can-
not, by making a sale to himself, alter his situation.   He remains a
trustee just as if there had been no sale.   His title is under the will,
not under the sale; for there was no sale which the law will re-
cognise.

Such a case as this is not affected by the act of limitations of the
4th of *April,* 1797.   It is not necessary to contend, that the debts
of *Peter Lantz* remained a lien on his estate.   Lands may be sold
though there be no lien.   If it be said, there is a judgment against
the heir, and the plaintiff is a creditor, and not a purchaser, the an-

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-
tenants.)

swer is, the defendant is also a creditor. Their equities are, there-
fore, equal, and the defendant has the priority; because, his debt at-
tached upon the land first, as the estate of the testator immediately
on his death.

*Binney*, for the appellee.—Has the creditor of the testator lost
his lien upon the land? On the 19th of *February*, 1816, the will
of *Peter Lantz*, which contained a power to sell, was proved. On
the 8th of *June*, 1816, a sale was made by the executors to *Isaac
Lantz*, and on the 16th of *November*, 1816, a deed for the premises
was executed by the executors to the purchaser. The security may,
at first, have rested on the personal responsibility of *Isaac*, but he
afterwards actually gave bond with security, which was cancelled
when he reconveyed. The purchase money was payable partly
down, and partly by instalments. On the 19th of *March*, 1817,
*Isaac* conveyed a moiety to *Jacob* for one-half of the original con-
sideration; on the next day, they both conveyed a portion of the
land to *George Lantz*, in satisfaction of his share. On the 2d of
*April*, 1822, *Isaac* conveyed to *Jacob* the residue, for the conside-
ration of three thousand five hundred dollars. Thus *Jacob*, if the
sale was not a nullity, became the owner of the whole on the 2d of
*April*, 1822. On the first of *April*, 1818, 1819, and 1820, respec-
tively, portions of the purchase money became due. In *April*,
1818, *Jacob Lantz* paid to the children of the testator, except *John*,
the proportions then due to them under this sale. On the 16th of
*April*, 1818, the widow received five hundred and twenty-seven
dollars and thirty-two cents. The legatees received what was due
to them in 1819 and 1820. Thus the sale was ratified by the lega-
tees. It was after this ratification that *Isaac* conveyed to *Jacob*.
Eight years elapsed after the death of the testator before *Best*
brought any suit on his bond. The bond was a joint and several bond,
given by *Peter Lantz* and *Peter Sailor* to *John Lantz*, who as-
signed it to *John Best*. The creditors of *Jacob Lantz* desired
*Best's* executors to transfer the bond to them, which was refused.
Having shown, that there was no equity in the legatees, or the cre-
ditors of *Peter Lantz*, we approach the points involved in the case.

1. Had the plaintiff a right to have execution of the lands in
question, as the estate of *Jacob Lantz?* If, at the time the judg-
ment was obtained, he had any estate, discharged from the lien of
the debts of the deceased, the plaintiff had a right to take it in
execution. If, on the other hand, the estate continued to be that
of *Peter Lantz*, he had no such right. A sale under the will, had
the effect of discharging the land from the lien of the testator's
debts, and substituting the proceeds of sale as a fund for their pay-
ment. It was not the case of a power to sell for legacies, but a ge-
neral order to sell for the purposes of the will, to pay both debts
and legacies; and in this respect, it differs from *Hannum* v. *Spear*.
That such was the intention of the testator, is deducible from the

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-
tenants.)

whole tenor of the will, in which, nothing is said about payment of
debts out of the personality, and there is no evidence of its suffi-
ciency for that purpose.  In *England,* the provisions of this will
would subject the land to the payment of simple contract debts.  If
the power was to sell both for debts and legacies, the purchaser held
it discharged, and was not bound to look to the application of the
purchase money.  *Grant* v. *Hook,* 13 *Serg. & Rawle,* 263.  *Ram-
bler* v. *Osgood,* 1 *Johns. Ch. Rep.* 1.  14 *Johns. Rep.* 587.  1 *Salk.*
152.  *Co. Litt.* 290, *b. Note,* 249.  *Rogers* v. *Skillincorne, Amb.*
188.  *Sugd. on Vend.* 332.

2.  As to the execution of the power, it is conceded, that if it was a
nullity, it produced no fruit.  Taking it for granted, however, that
*Jacob* was interested in the purchase, there is no authority to show,
that the sale was therefore void.  It certainly was not void at law.
The trustee purchaser can be held to his bargain, and if relief be
sought against him, it is, in equity, to declare him a trustee.  But be-
fore the sale can be rescinded, what the purchaser has paid should
be tendered to him.  The principle by which such cases are go-
verned is, not that the trustee shall not buy, but that he shall not
buy to make advantage.  Here a very high price was given for the
estate.  3 *Ves.* 740.  *Madd. Ch.* 110, 112, 114.  *Lazarus* v. *Bryson,*
3 *Binn.* 54, 62.  At law, *Isaac Lantz* was a purchaser under a
power in the will; and *Jacob* was at law a purchaser from *Isaac.*
The only persons who had a right to object, were the legatees of
the testator, and they have all ratified the proceeding.  Suppose the
power had been to sell for the purpose of making a division, and
the estate had been put up by the executors, with the consent of the
legatees, and purchased by the executors, can it be doubted the sale
would be good?  And subsequent confirmation is equivalent to ori-
ginal consent.  The party objecting is the creditor of the testator,
and he has no right to do so.   His lien on the land was discharged
by the operation of the act of assembly of the 4th of *April,* 1797,
*Purd. Dig.* 533, which limits the lien of the debts of a decedent
to seven years.  Eight years had elapsed after the death of *Peter
Lantz,* before the plaintiff commenced his suit.  It cannot be pre-
tended, that an executor or trustee can in no case be a purchaser.

It is objected, that no security was given, and that the want of it
vitiated the sale.  By the will, the executors were to take " security
to their satisfaction;" and a similar stipulation was made in the con-
ditions of sale.  Such security they took in the bond of *Isaac* with
surety.  Upon the whole, the sale was valid.  It might have been
questioned, but stands good for want of having been questioned
by those who had a right to do so.

The opinion of the court was delivered by

ROGERS, J.—At a very early day, the legislature departed so far
from the *English* system of jurisprudence, as to make all debts of

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-
tenants.)

what character soever, chargeable on the real and personal estate of
the debtor. Under the act of assembly of 1705, the real estate of debt-
ors has been held liable to sale by execution, whether they be living
or dead; if living, under a judgment and execution against them-
selves; if dead, under a judgment and execution against their heirs,
executors, or administrators. Debts, whether by simple contract or
otherwise, were decided to be a lien on the real estate of the de-
ceased, in the hands of an alienee, as in *Graff* v. *Smith's Ad-
ministrators,* 1 *Dall.* 482, where it was ruled, that lands of a de-
ceased person were bound for the payment of his debts, and might
be taken in execution, although the heir or devisee, may have sold
them to a *bona fide* purchaser. As this produced inconvenience, the
legislature passed the fourth section of the act of 1797, in which they
recite the mischief intended to be remedied, with a reference, as I
conceive, to the decision of the court in the case to which I have
referred.

"Whereas inconveniences may arise from the debts of deceased
persons remaining a lien on their lands and tenements, an indefinite
period of time after their decease, whereby *bona fide purchasers*
may be injured, and titles become insecure, therefore, be it enacted,
"That no such debts, except they be secured by mortgage, judg-
ment, or recognisance, or other record, shall remain a lien on the
said lands and tenements, longer than seven years after the decease
of such debtor, unless an action for the recovery thereof be com-
menced and duly prosecuted against his or her heirs, executors, or
administrators, within the said period of seven years; or a copy, or
particular written statement of any bond, covenant, debt, or de-
mand, when the same is not payable within the said period of seven
years, shall be filed within the said period in the office of the pro-
thonotary of the county where the lands lie."

Independently of this act, the title of the terretenant would clearly
be good, because the real estate must be first applied to the payment
of the debts of the deceased, rendered liable by prior enactments,
to be taken in execution and sold, without limitation in point of
time, even in the hands of a *bona fide* purchaser. The debts would
be a continuing and subsisting lien up to the time of the sale, to the
terretenant. It becomes, then, necessary to inquire, whether such
proceedings have been had, as to divest the right of the creditors
of *Peter Lantz* to look to the real fund for payment of debts. The
title of *Jacob Lantz* depends upon a sale by the executors, in pur-
suance of a power in the will of the deceased; and I will assume,
that the will authorised the executors to sell; and that so far as re-
pects the *indicium* of execution, the power has been regularly pur-
sued, and that the sale has been ratified by the devisees and heirs.
It appears in evidence, that *Jacob Lantz,* one of the executors, was
a joint purchaser, and that he afterwards became, and at the rendi-
tion of the judgment against the executors of *Peter Lantz,* was the

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-
tenants.)

sole owner of the estate. Is he, then, such a purchaser as is con-
templated by the fourth section of the act of assembly of 1797?
Although in *The Lessee of Lazarus* v. *Bryson,* 3 *Binn.* 58, the
late Chief Justice says, that a purchase by a sheriff, where he is
buyer and seller, is *void;* yet, I agree with the counsel, that the
title of the executor was not *void,* but *voidable.* The power in the
will constitutes the executors trustees for the devisees and heirs;
the general law, with the devise, trustees for the benefit of the cre-
ditors. The creditors have an interest in the fund, paramount to the
title of the devisees and heirs, and independent of the will of the
testator. Where, then, the executor, or a trustee, becomes the pur-
chaser, he takes it clothed with the same trusts as it was liable to in
his hands previous to the sale. The law will not endure, that a sham
sale, or one against public policy, shall create a right in prejudice
of creditors, who have liens upon the land; nor should their rights
be impaired without an express assent on their part. The creditors
should still, notwithstanding a pretended sale or transfer, which
may be a mere cover to fraud, be at liberty to pursue their remedy
against the executors, and upon judgment and execution to sell the
land, as they would have an unquestionable right to do, if it were in
the possession of the heirs or devisees; nor does this contravene the
principle of *Grant* v. *Hook,* 13 *Serg. & Rawle,* 259, that where
the testator authorised his executors to sell as much of his real es-
tate as should be necessary to pay his debts and educate his minor
children, the executors had power to sell the real estate of the tes-
tator free from the incumbrance of his debts, and the purchaser was
not bound to see to the application of the purchase money. And
this is doubtless the law, taken with the qualification, that the pur-
chaser is not both buyer and seller; for it would be highly unrea-
sonable, that the purchaser, who is a stranger, shall be answerable
for the misconduct of the executor, arising from a misapplication of
the purchase money. He is not expected to see to the observance
of a trust, unlimited and undefined. But where the executor be-
comes the purchaser, the reason does not exist, and I cannot per-
ceive the justice in his favour, or for the benefit of his creditors, of
divesting the lien against the real estate, and turning it into a per-
sonal right against the fraudulent trustee. I say fraudulent trustee,
for the law so regards him as having acted in contravention of pub-
lic policy. It would be unwise to throw such a temptation in the
way of executors and heirs, who by combination and fraud, may af-
fect the rights of creditors. Such a consequence of the power to
sell does not accord with the spirit of our laws.

 Great reliance is placed on the fact, that at the commencement
of the suit against the estate, more than seven years had elapsed
from the death of *Peter Lantz.* It must be remembered, that the
act of 1797, does not create, but limits the lien. Accordingly, it
has always been held, that the lien does not cease to exist, except

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-tenants.)

as against *bona fide* purchasers, for the generality of the enacting clause is restrained by the preamble. The lien of the creditors still continues, unless divested by a sale to a person, who stands in that situation. The argument is, that the sale is voidable; and I agree that it is, and that the devisees or heirs, have validated the sale by the acceptance of their respective shares of the purchase money. As against those who have received their money in whole or in part, with a full knowledge of the transaction, the sale would operate as a legal transfer, by force of the subsequent assent; for it would be against equity for them, under such circumstances, to dispute its validity. But although it is clear, that they can affirm the sale, yet, it is equally plain, that each can affirm the sale only for himself. And if this is the case, as respects the heirs or devisees, whose titles are co-ordinate, how much more forcibly does the principle apply to creditors who claim paramount to the devisees, and whose lien covers the whole fund. The creditors of *Peter Lantz* have done no act which can be tortured into an affirmance of the voidable title of the executor. So far from assenting to the sale, they elect to proceed against the fund; primarily liable for their debt. *Jacob Lantz* had it in his power to vest a complete title in himself, by payment of the creditors. But this he has neither done, nor offered to do. As there has been, then, no such absolute transfer of the title, as the law recognises, the creditors have a right, and this they have done, to consider the land in the same situation it was when *Peter Lantz* died; and if so, their lien continues unaffected by lapse of time. The purchase by a trustee, of the interest of the *cestui que trust*, has always been viewed with great jealousy. They are not allowed to purchase the trust property, because, from their situation, and the knowledge it enables them to acquire, they may be induced to commit a fraud upon their *cestui que trust*. It is not necessary to show, that the trustee has made an advantageous purchase, or that there was fraud. The law has prohibited it altogether, to prevent the temptation to which the interest of the *cestui que trust* would necessarily be exposed. The rule has been wisely adopted to prevent fraud; and as I am opposed to any relaxation, I am of opinion, in which I have the concurrence of a majority of the court, that the judgment be reversed, and a new trial awarded.

Gibson, C. J.—It seems to me, the verdict ought not to be disturbed. Whether *Best's* lien, under which the defendant purchased, were originally divested by a valid execution of the power or not, it is certain, that when he instituted his action, it had expired by efflux of time, and was extinct to every intent and purpose. I take this species of lien to be analagous to that of a judgment, which ceases at the end of the prescribed period, without regard to considerations derived from the absence of actual notice, as was held in *The Bank of North America* v. *Fitzsimons, 3 Binn.* 342. To remove all

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-tenants.)

uncertainty on this head, the legislature has declared record notice to be indispensable; and after a declaration so explicit, it seems to me, we can substitute nothing else. The laws have heretofore fostered the freedom of alienation, which habits of enterprise, unparalleled in any other people, have rendered essential to the well-being of society. Even the lien of a judgment, although it be matter of record, is not tolerated beyond a period of shorter duration than is assigned to this unregistered lien of a decedent's debt. It would, therefore, be against the spirit of legislation, evinced in parallel cases, to extend it by implication. The plain intent was to allow the creditor a period, in the first place, sufficient in all reason, for the assertion of his claim; and after that, to hold him strictly to re-cord notice. At the institution of *Best's* action, the lien of his debt was gone. Nor was it prolonged by the provisions of the will. As regards legacies, blending the real with the personal estate, so as to constitute one entire fund, subjects the land to the burdens of the personal assets. But such a blending, uncoupled with an express direction, is insufficient to charge the land with the debts. In *England,* frequent ineffectual attempts have been made to induce the parliament to declare simple contract debts to be a charge by law. But the evil resulting from the want of such a provision, has been much lessened by the frequency of testamentary provisions for payment of debts; and these are consequently interpreted as liberally as the words will bear. Yet it was long doubted, and is perhaps not yet settled, whether a general direction to pay in the first instance, renders the debt a charge. With us, every species of debt is charged for a limited time by act of the legislature; still the *English* cases are authority to show, that the blending of the two funds is not sufficient, *per sé*, to place the creditors on higher ground than is assigned to them by the laws. In the will before us, the whole estate is thrown into a common fund, for purposes of distribution among the children; not one word being said about the creditors, who are, therefore, left to their legal rights. Then the lien of *Best's* debt having been gone at the institution of his action, it remains to inquire, whether the execution of the power can be questioned by a purchaser under the judgment, and whether the reconveyance to *Jacob Lantz,* together with the extinguishment of the claims of the other children, does not constitute him a purchaser of at least an undivided interest in the estate. If the affirmative be made out, it will follow, that nothing but his own share was subject, as the estate of the decedent, to *Best's* execution.

It must be admitted, that the power was defectively executed in equity, and perhaps, even at law. *Jacob Lantz* was a secret purchaser at his own sale, and on the reconveyance of the ostensible purchaser, chancery would undoubtedly have declared him a trustee for those beneficially entitled under the will. But nothing is clearer, than that they might ratify in equity an execution of the power good

(Bruch, who survived Ihrie, *v.* Lantz, with notice to Porter and others, terre-
tenants.)

at law; and for this purpose, nothing was necessary but an act *in
pais*, that should satisfactorily indicate their assent.  So, if the
power were executed defectively at law, or not at all, they were
competent to waive the execution of it altogether, and take the land
itself, instead of the price.  The doctrine on this point is stated in
*Craig* v. *Leslie, 3 Wheat. 563.*  It seems to me, that by extin-
guishing the claims of his brothers and sisters, *Jacob Lantz* be-
came the equitable owner of the whole estate, and that choosing to
dispense with the execution of the power, as useless, the estate is
in him by operation of law.  I lay out of the case all consideration
of his having been an executor.   Different rights in an individual,
are to be treated, *reddendo singula singulis*, as if they existed se-
parately in different persons.  *Had he been a trustee of the land*
FOR THE CREDITORS, they might perhaps have been entitled to the
benefit of his purchase; but I think, it is clear, they had not a par-
ticular interest under the will.   As a tenant in common with his
brothers and sisters, I know of no rule of law to prevent him
from purchasing their estates.  Take it, that the transaction is to be
scanned more narrowly than if it were with a stranger; still, if it
were *bona fide*, and not to elude the debts, it is not easy to see why
it shall be deemed fraudulent for reasons of policy.  If it were
fraudulent in fact, that might be shown; but actual fraud is not pre-
tended, and if a tenant in common may, in any case, be a purchaser
of the estates of his co-tenants, *Jacob Lantz* is such.  To the va-
lidity of his title, they have precluded themselves from objecting,
and they do not object. .What right, then, had *Best*, who had no inte-
rest in the land, equitable or legal, to object; or have execution of
it in the hands of one who had paid for it?   I admit, that the share
of *Jacob Lantz*, himself, for which he paid nothing, passed by the
levy and sale to the defendant; but, it seems to me, the shares of
the other children are bound by the plaintiff's judgment, and liable
to execution; the *quantum* of their interest to be determined in an
action of partition between the defendant and the purchaser.

   TOD, J. having been unwell during the argument, took no part
in the decision.

                Judgment reversed, and a new trial awarded.