2w 53.
178  251

## | Penn *against* Hamilton.

A judgment originally obtained against the personal representatives of a decedent, will continue to be a lien on the estate for seven years: if revived by *scire facias* within that period, the lien will be thereby continued for five years longer; and if either period elapse without a *scire facias*, the lien is lost, whether the lands be in the possession of devisees or purchasers from devisees.

ERROR to the common pleas of *Cumberland* county.

This was an action by John Penn, Sen., who survived John Penn, Jun., against Samuel Alexander, Esq. and Frederick Watts, Esq., administrators *de bonis non* of James Hamilton, Esq., deceased, in which the parties agreed to consider the following facts in the nature of a special verdict.

On the 25th of March 1793, Ephraim Blaine was indebted to John Penn, Sen. and John Penn, Jun., and executed to them four bonds; the first conditioned for the payment of 36 pounds, on the 25th of July following; the second, for the payment of 376 pounds at the same time; the third, for the payment of 448 pounds at the same time, and the fourth, for the payment of 83 pounds on the 25th of July 1794; all with interest from their date.

On the 11th of February 1800, Ephraim Blaine made his last will and testament, by which, *inter alia*, he devised his Middlesex estate, containing about five hundred acres, with mills and other water-works thereon erected, to his wife, Sarah E. Blaine, for life, if his son Ephraim did not arrive at the age of twenty-one years; but if he did, then the estate was devised to him : in the event of the death of his said son Ephraim before he arrived at the age of twenty-one, then the remainder in fee was devised to his two grandsons, Ephraim L. Blaine and Ephraim M. Blaine; to wit, that part upon which the mills and water-works were erected, containing about two hundred acres, to his grandson, Ephraim L. Blaine, and the other part to his grandson, Ephraim M. Blaine. The testator died; and this will was proved on the 19th of March 1804. Ephraim Blaine, the son, died in 1805, before he arrived at the age of twenty-one; the widow, Sarah E. Blaine, took possession of the estate under the will. Amicable actions of debt were entered on the above mentioned bonds, to November term 1806, Nos. 45, 46, 47, 48, and the docket entry of each suit exhibits the following entry.

"John Penn, surviving obligee, in a bond to John Penn the elder and John Penn the younger, which John Penn the elder is since deceased *v.* James Blaine and Robert Blaine, executors of Ephraim Blaine deceased. No. 45, November term 1806."

The following is the statement filed : "Amicable action of debt

on bond dated the 25th of March 1793, in the sum of 752 pounds, conditioned for the payment of 376 pounds on the 25th of July following, with interest from the date. Paid on bond 29th of March 1793, 206 pounds and 5 shillings ; as per agreement of Mr Watts, attorney for defendant.

"January 8th 1807. Judgment *per curiam,* no defence being made, and plaintiff agrees to default any receipts.

" Amicable *scire facias,* P. *A.* et *D.,* to revive those judgments, were entered on the docket to January term 1813, Nos. 47, 48, 49, 50. The entry on the docket of each of those cases is thus :

" John Penn, surviving obligee in a bond with John Penn the younger, which John Penn the elder is since deceased *v.* James Blaine and Robert Blaine, executors of Ephraim Blaine deceased. No. 47, January term 1813. Amicable *scire facias,* P. *A. et D.* 29th December 1812. Judgment by direction of defendant's attorney. Agreement filed as now. *Exit scire facias,* P. *A. et D.* No. 120, November term 1821."

29th December 1812. Judgment per agreement filed as now.

On the 11th of June 1818, Sarah E. Blaine, for the consideration of 5000 dollars, sold and conveyed that part of the Middlesex estate which she derived under the will of her husband, and the remainder of which was devised to Ephraim L. Blaine, to the said Ephraim L. Blaine, who then entered into the possession thereof, and thenceforth enjoyed the same. On the 26th of August 1818, Sarah E. Blaine, for the consideration of 5000 dollars, sold and conveyed that part of the Middlesex estate which she derived under the will of her husband, and the remainder of which was devised to Ephraim M. Blaine, to the said Ephraim M. Blaine, who then entered into the possession thereof, and thenceforth enjoyed the same. On the 12th of June 1818, Ephraim L. Blaine, for the consideration of 45,000 dollars, sold and conveyed the tract of land, mills and water-works, devised to, and purchased by him, to James Hamilton, who then entered into the possession thereof, and thenceforth enjoyed the same, until the time of his death, which happened on the 20th of January 1820. To November term 1821, Nos. 123, 124, 125, 126, writs of *scire facias* were issued, to recover the before mentioned judgments against the executors of Ephraim Blaine deceased.

On the 9th of October 1826, Ephraim M. Blaine, by articles in writing, agreed, for the consideration of twelve thousand dollars, to sell and convey the tract of land so devised to and purchased by him, to Samuel Alexander, esquire, and to deliver him possession thereof on the 1st of April then next following ; in pursuance of which, the ·said Samuel Alexander did then enter into the possession thereof, and thenceforth did possess and enjoy the same. On the 12th of May 1828, on the several writs of *scire facias* issued to November term 1821, as before mentioned, the death of Robert Blaine, one of the executors, was suggested. A rule on the defendant to plead was obtained by the plaintiff's attorney on the 22d of No-

vember : a second rule to plead was obtained on the 26th of November 1828, and judgment in each case was entered *secundum regulam.* In pursuance of the articles of agreement before mentioned, a deed of conveyance was executed and delivered by Ephraim M. Blaine to Samuel Alexander, esquire, on the 20th of November 1829. On the 14th of August 1831, Frederick Watts, esquire, who is the administrator *de bonis non* of James Hamilton deceased, by an order of the orphan's court of Cumberland county, sold part of the Middlesex estate, which had been conveyed to the said James Hamilton as aforesaid by Ephraim L. Blaine, to John Heike; which sale was confirmed by the said court on the 1st of September 1831 : the other part of the said estate of which the said Hamilton died seised, was sold by the said Frederick Watts, esquire, in pursuance of the same authority, to Charles B. Penrose, esquire, and the amount of the proceeds of the sales, when due, will be above 20,000 dollars. "It is also hereby agreed by the parties, that all the records of the suits referred to, and the executions issued thereon, and papers hereby referred to, shall be considered as a part of this special verdict, abstracts of which may be exhibited herewith. If the court should be of opinion that the judgment of John Penn, Sen., surviving John Penn, Jun., against the executors of Ephraim Blaine deceased, as before recited, or any part of it, is not a lien or payable out of the land in the possession of the said Samuel Alexander, as aforesaid, and was not a lien upon the land sold by the said Frederick Watts, esquire, administrator of James Hamilton deceased, at the time it was sold, and is not payable out of the moneys proceeding from the said sale, then judgment to be entered for the defendants. But if the court should be of opinion that the said judgment is a lien upon the said land of Samuel Alexander, and payable out of the same, and was a lien upon the land when sold by the administrator of James Hamilton deceased, and is payable out of the proceeds of said sale, then judgment to be entered for the plaintiff, against Samuel Alexander, esquire, of the tract of land aforesaid, and against Frederick Watts, esquire, administrator *de bonis intestati.* And if the court should be of opinion that the said judgment was a lien upon the land so sold by the administrator of James Hamilton, deceased, at the time of the sale thereof, and is not a lien against the land of the said Samuel Alexander, esquire, then judgment to be entered in favour of the said plaintiffs against Frederick Watts, esquire, administrator *de bonis intestati,* alone, and not against the said Samuel Alexander. And if the court should be of opinion that the said judgment is a lien against the said land of Samuel Alexander, esquire, and was not against the land so sold by the said administrator of James Hamilton, then judgment to be entered for the plaintiff against Samuel Alexander, esquire, *de terris,* and in favour of the said Frederick Watts, esquire, administrator."

The court rendered a judgment for the defendants.

*Biddle,* with whom was *Williamson,* for plaintiff in error.

[Penn v. Hamilton.]

By the acts of 1700 and 1705, *Purdon's Digest* 288, 299, all lands, tenements and hereditaments in Pennsylvania, are liable to sale upon judgment and execution obtained against the owner, his heirs, executors or administrators; and in the earliest cases reported it was held, that lands of deceased persons, after the passage of these acts, were subject to be taken in execution for debt in the hands of the heir or devisee, or of a *bona fide* purchaser from them.    Graff *v.* Smith's Executors, 1 *Dall.* 481 ; Morris *v.* Smith, 1 *Yates* 245 ; Hannum *v.* Spear, *Ibid.* 554.   The lien of a decedent's debt (no limit being made by either of the acts referred to) was of indefinite duration, and that it was so considered is evident from the preamble of the act of the 4th of April 1797, *Purdon's Dig.* 421, and the opinion of the court in Trevor *v.* Ellenberger, 2 *Penn. Rep.* 95, in which it is said, " before the act of 1797, the debts of a deceased person remained a lien for an indefinite length of time."   This latter act provides that no debts of a decedent, except they be secured by mortgage, &c. or other record, shall remain a lien on lands for a longer period than seven years, unless an action for the recovery thereof be commenced and duly prosecuted within the said period of seven years, with a proviso in favour of *femes covert*, minors, persons in prison, or out of the limits of the United States, whose claims continue liens, notwithstanding the expiration of the said term, until four years after the disability is removed.   The plaintiff in this suit having obtained his judgment within four years after the death of Mr Blaine, brought himself fully within the conditions of this act : he had *duly prosecuted* his claim within seven years ; it was a debt secured by record, and to all intents and purposes he stood in the same situation as if this law had never had an existence ; in other words, nothing but presumption of payment from lapse of time could affect him.   He had " *duly prosecuted*" for his judgment, put an end to the action, 3 *Jacob's Law Dic.* 583, and the intention of the act which was to give notice to all the world of his claim was attained.   Again, the words used are, " duly prosecute within seven years."   Now unless this duly prosecuting be confined to obtaining a judgment, and not to reaping the fruits of it within that period, the proviso is useless.   Neither the case of Fryhoffer *v.* Buzby, 17 *Serg. & Rawle* 121, nor that of the Agricultural Bank *v.* Crever, 2 *Rawle* 224, has any application to the question of the indefinite lien of a decedent's debt.   They merely decide that a judgment obtained in the *life time*, and regularly revived, should be paid out of the proceeds of land, before a prior judgment that had lost its lien on the property sold.   It was not pretended that the judgment creditor, whose priority of lien was gone, as against the more vigilant creditor, did not, after the decedent's death, retain a lien against his lands in the hands of the heir or devisee or those claiming under them.   In Trevor *v.* Ellenberger, it is said, that if no suit is brought against the representatives of a decedent, the lien of the debt continues for seven years; but that if suit is brought before the expiration of that time, the lien will con-

[Penn v. Hamilton.]

tinue *until five years after judgment obtained.* There must be some mistake in this, for the facts do not warrant the rule laid down. There the testator died in 1816, judgment was obtained in 1820, and a *scire facias* did not issue for *six years after*, and yet the claim was held to be a subsisting lien. Again, if the lien of a decedent's debt be limited to five years after judgment on it against his representatives, the creditor who prosecutes to judgment within a year after the death, has a lien of shorter duration than if he had brought no suit at all. Nor does the act of 1797 justify such a conclusion; for after reciting that the debts of deceased persons are a lien on their lands and tenements for an indefinite period of time after their decease, it enacts that no such debts shall remain a lien longer than seven years, *unless* an action be commenced and duly prosecuted, &c. Nothing is said of the duration of the lien when the condition of the act is complied with, and of course it remains indefinite as it was before. It is true that the act of 1798, *Purdon's Dig.* 421, makes it incumbent on the creditor who wishes to preserve the lien of his judgment, to revive the same by *scire facias* within five years; but this relates to judgments *inter vivos*, and *not* to those obtained against their representatives. The court say, in Ellenberger *v.* Trevor, the act of 1798 was not intended to interfere with that of 1797. The lien of the debt of a decedent is not by reason of the *judgment* against his representatives, it is created by his death. A judgment had against administrators or executors, has not the effect of merging a simple contract debt. Thus such judgment on a simple contract claim would be postponed to a specialty on which no suit had been brought, as a judgment in the latter would give place to a debt by recognizance. In short, the act of 1798 is confined to judgments in the life time, whilst that of 1797 speaks of debts the nature of which is not altered by a judgment against the representatives. Why, then, issue a *scire facias* to continue the lien of a debt the duration of which is indefinite when the conditions of this latter act are complied with? Nor is there any peculiar hardship in the law as contended for. By the other provisions of the act of 1797 in favour of minors, *femes covert* and persons out of the United States, where no notice is requisite, the most disastrous consequences might result to purchasers from heirs or devisees; but in cases like the present, where suit has been brought and the claim liquidated within seven years from the testator's death, purchasers would always be secure, by using due diligence. There is no necessity, therefore, for straining the law and making the act of 1798 apply its provisions to that of 1797, to which it has no legitimate reference.

*Watts, Alexander* and *Carothers,* for defendants in error, cited, Allen *v.* Sawyer, 2 *Penn. Rep.* 325; Kauffelt *v.* Bower, 7 *Serg. & Rawle* 73; Irwin *v.* Tabb, 17 *Serg. & Rawle* 419; Cowden *v.* Brady, 8 *Serg. & Rawle* 505; Bombay *v.* Boyer, 14 *Serg. & Rawle* 253;

II.—H

[Penn v. Hamilton.]

Bowers *v.* Oysters, 3 *Penn. Rep.* 239; 2 *Rawle* 224; Kerper *v.* Hoch, 1 *Watts's Rep.* 9.

The opinion of the Court was delivered by

GIBSON, C. J.—The principle of Trevor *v.* Ellenberger, though not fully expressed in the opinion delivered, will be found to cover the whole field of the controversy. It was admitted that the lien of creditors on a decedent's land, springs exclusively from the intestate laws which make his estate a fund for payment of his debts; insomuch, that nothing is added or gained by a judgment against his representatives; and that the act of 1798, by which is provided a peculiar *scire facias* to prolong the lien of judgments *inter vivos,* is not directly applicable to it. But it was distinctly asserted that a decedent's lien, also, might be prolonged by *scire facias;* and the construction by which that result is obtained, is the matter to be shown.

The act of 1797, which gives rise to it, provides that no debts but such as are secured by mortgage, judgment, recognizance or other record, shall remain a lien on the lands of a decedent longer than seven years from his death; "unless an action for the recovery thereof be commenced and *duly prosecuted* against his or her heirs, executors or administrators, within the said period of seven years; or a copy or particular statement of any bond, covenant, debt or demand, where the same is not payable within the seven years, shall be filed, within the said period, in the office of the prothonotary of the county where the lands lie." It is evident from the context, that the excepted liens are such as have been acquired in the decedent's lifetime; and that they are thus mentioned to preclude the implication of an intent to abridge or impair them. The difficulty in Trevor *v.* Ellenberger, was to determine when an action should be "duly prosecuted;" and it was thought not to be so, within the meaning of the act, when prosecuted to judgment merely, because that construction might extend the lien to some twenty or thirty years without a further act done, as the presumption of payment from lapse of time would run but from the rendition of the judgment, which might be several years after the expiration of the original limitation. The law is a remedial one, and we thought ourselves bound to make such a construction of it, liberal though it were, as would best advance the remedy and repress the mischief. In legal estimation, judgment is doubtless the end of prosecution; but that can scarce be thought the sense in which the words were used by the legislature. That the inconvenience of stale liens was beginning to be felt, is evident not only from the act in question, but from the act of the year following, for the limitation of the lien of judgments; and we cannot suppose that the legislature, proceeding systematically to the removal of it, intended to pay respect to any discriminating circumstance depending upon origin. It was of little moment as to consequences, whether the lien had its root in a judgment, or was but dependent

[Penn v. Hamilton.]

on one for its continuance, as the mischief from an indefinite duration of it would be the same ; and it may appear singular, that the provisions of the act of 1798 were not extended to a judgment in prosecution of a decedent's lien, in terms.   The omission is doubtless attributable to inadvertence in respect to the fact, at that time not a very obvious one, that a judgment against a decedent's representatives, is not a lien on his lands, the lien created by the intestate acts being exclusive of it.   In restraining the lien of a judgment, the legislature certainly did not purposely omit a like provision for a lien depending on a judgment for its continuance, merely because its origin is elsewhere.   Such a lien, though not within the letter, is certainly within the equity of the act ; and if the intent were, as I think it was, to compel the creditor to give notice to purchasers by the institution of an action on the principle of *lis pendens,* without, at the same time, compelling him to sacrifice the land, and perhaps his debt along with it, the instant he should entitle himself to execution, the period which the lien shall be suffered to endure afterwards cannot be left to a jury, under the circumstances, with either certainty or safety ; it must be a determinate one, and measured by the court as a conclusion of law.   But without resorting to parallel provisions for cases standing in the same mischief, it will be impossible to extract a definite rule from words of such indefinite import, as "duly prosecuted." When we find in a series of subsequent enactments on the basis of circumstances essentially the same, a particular period assumed as the reasonable and proper one for the duration of a lien depending on a judicial recognition of the debt—as five years for the lien of a judgment by the act of 1798, and the same period for the lien of a *testatum scire facias* registered in the proper county by the act of 1823—it seems reasonable to adopt it as an interpretation indicated by the legislature itself, in giving, as we are compelled to do, a determinate meaning to words which are not susceptible of a fixed construction, without resorting to this or some other assumption equally arbitrary.   The most plausible objection to it is, that to apply the specific provisions of a statute to cases merely analogous, partakes apparently of legislation as much as construction.   But it is the principle and not the specific provision that is applied by adoption as a rule of construction ; and it is to be remembered, that principles borrowed from statutes of limitations, to which class the act of 1798 certainly belongs, have been frequently applied by the courts with decisive effect, if not as a positive bar, to subjects not within their purview ; for instance in corporeal rights which are barred, in analogy to the 21 *Jac.* 1, by an adverse interruption of them for twenty years. In the same way, the British statutes of limitations have been adopted in practice by their courts of chancery, though expressly confined by the terms of their enactment to the courts of common law ; yet this has never been charged as a judicial encroachment on the prerogative of the legislature.   If, then, the principles of such a statute may be engrafted on a rule of equity or of the common

[Penn v. Hamilton.]

law, why may they not be resorted to for the interpretation of an ambiguous clause in a preceding statute *in pari materia ?* The lien of a judgment itself, though derived from the statute of *Westm.* 2, the original and still the general law in England for taking land in execution, depends on a provision borrowed from the statute *de mercatoribus* passed a few months later, which, in creating the recognisance called a statute merchant, declared that the conusee should have " execution of all the lands that were in the hands of the conusor, the day of the recognisance made, into whose hands soever they come after, either by feoffment or otherwise"—a clause that is not in the original statute, or in our acts for taking land in execution. Yet it is the origin of the lien attributed to judgments in the construction of that statute, as well as our own. In all cases like the present, where a court is called on to affix a definite meaning to words which were understood in no definite sense by those who used them, it is the safest and most reasonable course, to resort to their subsequent provisions for cases in the same circumstances. Taking then, the act of 1798 as a guide to the construction of the clause in question, it results, that in order to preserve a lien on the estate of a decedent beyond the limitation of seven years, an action must be prosecuted to satisfaction, or the judgment be revived as in other cases. To accomplish the latter, a resort to the *scire facias* instituted by the act of 1798, is not only unnecessary, but would be improper, for no such writ was known to the law when the clause in question was enacted ; and the writ given by the statute of *Westm.* 2, being adequate to the purpose, ought rather to be used. What remains then, is to determine the point of time from which the further limitation consequent on a revival, is to run. In Trevor *v.* Ellenberger, it was said, that if the creditor sue out a *scire facias immediately* before the expiration of the seven years, the lien will endure for five years longer ; from which it might be inferred, that it was supposed to run from the time of revival, and not from the end of the original period ; nothing of which was intended, for, counting from the judgment, the demand, in that case, would have been barred. It might be otherwise were the character of the lien changed or a new one created ; but as nothing more is done than to prevent the lapse of the old one, the second period is necessarily to be computed from the end of the seven years. Such then being the construction put on the act of 1797 in Trevor *v.* Ellenberger, how does it dispose of the case before us ? The decedent died in 1804 : the bonds were sued to November term 1806, and judgments recovered in 1807 were successively revived in 1812 and 1821; and executions issued in 1829 and 1830, were levied on the lands in question. It is an immaterial part of the case, that these lands had passed from the devisees of the decedent to purchasers, as the lien would have been gone without it. It was indeed taken for granted in Bruch *v.* Lantz, 2 *Rawle* 392, that the limitation was not designed to be a protection for volunteers ; but the point has since

[Penn v. Hamilton.]

been directly considered in Kerper *v.* Hoch, 1 *Watts* 9, and a contrary principle established against the inclination of my opinion, which I shall however be the last to question. In the case before us, judgment was properly given for the defendant.

Judgment affirmed.