## Alexander *against* M'Murry.

A testator, after devising a portion of his estate, thus disposed of the residue: "All the residue of my estate, real and personal, I order to be sold by my executors; and I empower them to convey the same in fee-simple. All the moneys arising from such sales I do give and devise to be equally divided between my two sons J. and R., or to their representatives if they or either of them should die before me; my just debts, and the devises hereinbefore made, being first paid; and I do hereby appoint my said two sons J. and R. executors of this my will:" *Held*, that there was not such an estate in the residue of the lands vested in the said J. and R. as was the subject of levy and sale for the payment of their individual debts, until the debts of the testator were first paid.

A devise of land to executors to be sold for the payment of debts and legacies vests the estate in them as a trust fund for that purpose, and if they neglect to execute the trust, the creditors may sell the land upon a judgment and execution, and the purchaser will take a good title; and in such case there is no limit to the lien of the debts short of a presumption of payment from lapse of time.

ERROR to the common pleas of *Westmoreland* county.

Samuel Alexander, Esq., against Acheson M'Murry. Ejectment for a tract of land. The title was originally in Ephraim Blaine, deceased, who, by his last will and testament, dated the 11th of February 1800, and proved the 19th of March 1804, after giving certain specific bequests and devises of his estate, thus disposes of the residue: "All the residue of my estate, real and personal, I order to be sold by my executors herein to be named, or by the survivor of them, and I do hereby empower them, or the survivor of them, to convey the same in fee-simple—and all the moneys arising from such sales, I do give and devise to be equally divided between my two sons James and Robert, or to their representatives, if they or either of them should die before me: my just debts, and the devises hereinbefore made, being first paid; and I do hereby appoint my two sons, James Blaine and Robert Blaine, and my friend David Watts, executors of this my last will and testament."

Letters testamentary issued to James and Robert Blaine alone, David Watts having renounced.

The testator died seised of the land in dispute as a tenant in common with his brother Alexander Blaine, and it formed a part of the residue of his estate. After the death of both, the executors of Ephraim and the heirs-at-law of Alexander Blaine, by an ac-

[Alexander v. M'Murry.]

tion, made partition of the land; and that in dispute was allotted to the executors of Ephraim Blaine.

On the 14th of May 1821, James E. Bredin obtained a judgment against James Blaine for 2400 dollars, upon which executions were issued, and the sheriff levied "on all the right, title and interest of James Blaine in the equal undivided half part of a tract of land situate in Hempfield township, adjoining lands of Michael Byerly, John M'Call, and the heirs of Henry Keck, deceased, containing 230 acres, more or less," and sold the same to John M'Murry by deed dated the 10th of April 1825, who by his will devised it to the defendant and his sister.

The plaintiff's title was founded upon a judgment obtained in the common pleas of Cumberland county on the 13th of May 1805, by William Morris against James Blaine and Robert Blaine, executors of Ephraim Blaine deceased, for 1410 pounds. This judgment was revived in 1808, and again in 1814; and upon a *testatum fieri facias* to Westmoreland county, No. 87, April term 1830, the same land was levied as the estate of Ephraim Blaine, deceased, in the hands of his executors, and upon a *venditioni exponas* to January term 1837, it was sold to Samuel Alexander, the plaintiff, for 1701 dollars.

The court below was of opinion, and so instructed the jury, that the sheriff's sale of the land upon the judgment and execution of James E. Bredin against James Blaine vested in the purchaser John M'Murry, a good title to the undivided half of the land; and, as to that part, they should find for the defendant, and added:

"It is to be remarked that there was in this case no judgment in the lifetime of Ephraim Blaine.  No revival of this judgment after 1814.  The *testatum fieri facias* entered in this county as late as 1830, and in the meantime a sale of the land for James Blaine's debt in 1825, and this after a partition had among the co-tenants, and no notice of any prior lien upon the land, and the defendant's title resting upon a judicial sale.

"Upon these facts, we do not see how the plaintiff can sustain his position, and we instruct you upon this branch of the case, that, as to the one-half of this land, he has failed to make good his claim; and as to the one undivided moiety, your verdict should be against him.

"As to the other half, neither Robert Blaine nor his representatives contest the claim of the plaintiff; and if you believe, from the testimony, that John M'Murry occupied the land by permission of Ephraim Blaine and his representatives—that the defendant came in under him, and had like permission to occupy—as to that moiety your verdict should be in favour of the plaintiff."

*Kuntz,* for plaintiff in error, cited 13 *Serg. & Rawle* 330; 2 *Rawle* 185; 4 *Rawle* 184; 1 *Whart.* 262; 3 *Wheat.* 573.

VIII.—2 s*

*H. T. Foster,* for defendant in error, cited 2 *Watts* 53; 3 *Whart.* 62; 3 *Wheat.* 563.

The opinion of the Court was delivered by

KENNEDY, J.—The first and second errors assigned will be considered together, as they relate to the question, whether James Blaine had such an interest or estate in the land in controversy as was liable to be taken in execution, and sold under a judgment against him in his own right? It is admitted, that whatever interest or estate he had in the land, he derived it from the will of his father, Colonel Ephraim Blaine, which contains the following clause, to wit: " All the residue of my estate, real and personal, I order to be sold by my executors herein to be named, or by the survivor of them; and I do hereby empower them, or the survivor of them, to convey the same in fee simple; and all the moneys arising from such sales, I do give and devise to be equally divided between my two sons, James and Robert, or to their representatives, if they or either of them should die before me: *my just debts,* and the legacies hereinbefore made, being *first paid;* and I do hereby appoint my two sons, James and Robert Blaine, and my friend David Watts, executors of this my last will and testament." Upon the death of the testator, Mr Watts renounced his executorship; and the two sons, James Blaine, from whom the defendant derives his claim to the land, and Robert Blaine, made probate of the will, and took out letters testamentary. The land in dispute forms a part of the residuum disposed of by the above clause. And though given to his two sons, James and Robert, yet it cannot be said to be given to them absolutely, nor even positively, as real estate. For it is only in the event of its not being wanted for the payment of the testator's debts, that it is given to them for their own use; but whether required for the payment of the testator's debts or not, it is given to his executors in the first place, under a direction to be sold by them, or the survivor of them, and converted into money; so that whatever is thereby given to his two sons is given in money after the conversion shall have been made. Then according to the decisions upon this subject, this, without something more being done than appears to have been done in this case, would not give to the sons such an interest in his residuary real estate as could be taken in execution, and sold for the payment of their respective debts. But there is a further objection that appears to be insuperable, which is, that they were not to have any of the money which should arise from the sale of the land, (and consequently could have no interest in the land itself,) until all the testator's debts, and the previous legacies given by him in his will, were first paid; so that it depended upon there being a surplus after the payment of the debts and the previous legacies, whether they would derive any benefit whatever from the residuary bequest. Now it appeared on the trial of the cause, that the debts were not all paid, and that the

[Alexander v. M'Murry.]

land in question was sold by the sheriff to the plaintiff for the very purpose of paying a debt of the testator; and so far as any thing was shown in regard to the residuary estate being sufficient for the discharge of all the debts, there is, perhaps, little or no reason to conclude that they ever will be fully paid out of it. Hence it would be the height of injustice to permit the land to be appropriated to the payment of the debts of the legatees, to the exclusion of the creditors of the testator. But be this as it may, I do not consider it necessary to rely on it in order to decide the present controversy in favour of the plaintiff. It is said, however, that it was competent for James and Robert Blaine to elect to take the land included within the residuary bequest to them as *land*, instead of the money which was directed to be raised by a sale of it. But certainly this could not be allowed without their first paying the debts and legacies charged upon it by the testator in his will. Surely it cannot be pretended that they had a right to do so, and to hold the land afterwards for their own use, without paying off the debts and previous legacies. This would be in direct violation of the terms of the will and the trust thereby created and committed to them as executors, which was the first office they were to perform. Upon no principle of justice or equity, therefore, could it be tolerated, to permit them to take the land as such, without discharging the charges expressly imposed upon it by the testator. But, again, under this alleged right to elect it is argued, that the partition made between them, as executors of the testator on the one part, and the heirs of Alexander Blaine on the other part, of the land in dispute, as a portion of a larger quantity embraced in the partition, and holden by the testator at the time of making his will, and also at the time of his death, and his brother, Alexander Blaine, as tenants in common, amounted to an election on the part of James and Robert Blaine to take the land in dispute as land, because it was assigned and set apart to them as land; but then the record of partition shows it was not assigned to them as land which they claimed in their own right, nor even as devisees under the will, but as executors thereof. The court below, it would seem, entertained the notion of its being an election on their part to take the land to themselves as land, and so instructed the jury. Here, we think, the court below fell into an error. Because, whether James and Robert Blaine intended to make such election or not, their having a partition made of the land was altogether proper, as preparatory to their making a sale of it, as executors, for the purpose directed by the will. It was no doubt highly expedient to have partition made with a view to advance the price that should be obtained thereafter for it upon such sale; as it is reasonable to suppose that it would be likely to bring a higher price when sold in severalty, and set apart by metes and bounds, than as an undivided interest held in common with others. Mr Watts having renounced his executorship, James and Robert Blaine were the only executors of the will at the time of making

[Alexander v. M'Murry.]

the partition of the land with the heirs of Alexander Blaine; and being invested with the legal title of their testator to the land under the act of assembly, by virtue of the authority contained in the will to sell it, had the right, therefore, to have partition made of it, as preparatory to a sale thereof. Had James and Robert Blaine, after having made partition as the executors of Ephraim Blaine with the heirs of Alexander Blaine, gone on and made a partition between themselves of the allotment set apart and asigned to them, as the executors of Ephraim Blaine, there might have been some show of reason, at least, for having inferred thence that they had determined to take it as land for their own use under the will; but it has been shown above that, without payment of the debts and legacies charged upon the land, it was not competent for them to do this. But, in the partition made, we cannot perceive the least ground for such an inference. And this brings us again to the conclusion that James Blaine had no such interest or estate in the land in controversy, as could be taken in execution by his creditors, and sold for the payment of his debts; and, therefore, John M'Murry took nothing by his purchase at the sheriff's sale made at the suit of James E. Breding. This disposes of the two errors first assigned, and shows that the court below erred in their direction to the jury.

The remaining error assigned is, that the court erred in charging the jury that the plaintiff did not acquire the interest of Ephraim Blaine, the testator, in the land by virtue of the sheriff's sale made thereof, under the judgment of William Morris obtained against the executors. We also think that the court below erred in charging the jury to this effect. This case is distinguishable from Penn v. Hamilton, 2 *Watts* 53, and the other cases cited on the argument in favour of the defendant. The land, in the case of Penn v. Hamilton, was not given in trust to the testator's executors, and charged by him in their hands as a fund for the payment of his debts, as is done here. The land taken in execution there, was not intended by the testator to be held liable for the payment of his debts; it was specifically devised, and consequently was held discharged from the liens created by law merely, in favour of those debts for which judgments had been obtained against the executors after the death of the testator, but had not been prosecuted to execution with reasonable diligence, so as to keep the liens so created by law alive. Here, however, the land in question was given by the testator in charge to his executors for the purpose of being sold by them; and out of the moneys arising therefrom, in the first place, to pay his debts and the legacies previously given in his will; thus creating and confiding to them a trust which they, by taking out letters testamentary from the register, undertook to perform and execute. In order to have discharged the trust thus undertaken by them, they ought to have sold the lands intrusted to them for the payment of the debts and legacies, within a year after the testator's death, and to have paid the debts and legacies with the money arising there-

[Alexander v. M'Murry.]

from. Neglecting, however, as it would seem, to proceed in this way, they were sued by William Morris, a creditor of the testator, before the year expired, and a judgment obtained for the amount of his claim within less than three months after the commencement of the suit. The executors, however, notwithstanding this early and complete notice of Morris's debt, which the testator had expressly made a charge upon the land in dispute, still neglected to raise money by a sale thereof, as was their duty, to pay this debt. Ultimately, after the judgment obtained for it had been revived in 1808, and again in 1814, and various executions sued out thereon without being able to levy the amount of the debt, the land in contest was taken in execution and sold under it by the sheriff to the plaintiff in 1831.

Thus, it would appear that the plaintiff in the judgment was never paid his debt, but was desirous to recover it; and that there was such remissness on the part of the executors, as may fairly be considered a violation and abuse of their trust, in not having sold the land and applied the proceeds thereof to the payment of the debt long before it was levied on. But upon no principle, either of justice or sound policy, can it be allowed to trustees, who have at most only a contingent or resulting interest for themselves in the trust property, such as the executors had in this instance, to claim it as long as it appears that the object of the trust remains unexecuted, and it can not, therefore, be known whether they have any certain interest therein or not. The executors, or, more properly speaking, James and Robert Blaine, who took upon themselves the offices of executors and trustees, were merely entitled to the surplus of the residuary estate, if any should remain after paying the debts and previous legacies; and it is not to be tolerated that any lapse of time should operate in their favour, so as to give them an interest, or to increase it beyond what they would have a right to upon a faithful execution of the trust, short of that which would raise a presumption of the debts and legacies having been all satisfied. It is perfectly clear, however, no such presumption can arise here, for the commencement and prosecution of the suit by Morris for his debt to judgment, and the subsequent proceedings thereon, all repel it most completely, and show that the debt still remained unpaid when the land in question was taken in execution and sold for the purpose of paying it. To hold a different doctrine might tend to encourage trustees to delay the execution of the trust as long as possible, in hopes of gaining thereby, and thus permit them to profit or take advantage of their own neglect, or worse—of their wilful abuse of the trust and confidence reposed in them.

Having shown that the executors had no positive interest in the land, it follows, as a necessary consequence, that their creditors could not set up a right for them, which they had not and could not sustain themselves. I do not wish, however, to be understood as insinuating that the default of the executors arose from design on

[Alexander v. M'Murry.]

their part; on the contrary, I am well satisfied, in my own mind, from my personal knowledge of them, that it proceeded entirely from negligence and the difficulty and inconvenience of attending to it; and that they never intended to claim or to appropriate the residuary estate to their own use, until the debts of the testator were first paid out of it. There is no evidence that they ever did do so, or intended it; nor is there any reason to believe now, they both being dead, that their heirs or representatives pretend any claim to it, in opposition to the unpaid creditors of the testator. The objection, in this instance, to the land in question being applied to the payment of the debts of the testator, in discharge of the trust expressly created by him in his will for that purpose, has not come from the executors or their representatives, but has grown out of the mistake of a creditor of one of the executors, in supposing that the executor had such an interest in it as might be levied on and sold for his debts. Under the trust, then, created by the testator in the residuary clause of his will in favour of his creditors, we are of the opinion that they ought to be considered as having such a lien upon the estate thereby set apart for the payment of his debts, as gave them the right at any subsequent period, however late, as long as the trust remained unexecuted in their favour, through the neglect of the executors to perform it by converting the estate into money and paying the debts, to proceed against it by execution and levy the amount of their debts out of it, if sufficient for that purpose. Hence the levy and sale of the land in dispute under the Morris judgment, passed to the plaintiff, as the purchaser thereof, all the interest and estate which the testator or his executors, as such, had at any time in it.

Judgment reversed, and a *venire de novo* awarded.